**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SEAN GOTTLIEB,**<br>169 Commack Road, #1065<br>Commack, New York 11725<br>*Plaintiff,*<br><br>v.<br><br>**INTOUCH LANGUAGE INC.,**<br>**TOM LEE, General Manager,**<br>**APRIL (Last Name Unknown), Corporate Manager,**<br>440 Sylvan Avenue, Suite 282<br>Englewood Cliffs, New Jersey 07632<br>*Defendants.* | **Civil Action No. ___________________**<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Sean Gottlieb, appearing pro se, residing at 169 Commack Road, #1065, Commack, New York 11725, for his Verified Complaint against Defendants InTouch Language Inc., Tom Lee, and April (Last Name Unknown), alleges upon personal knowledge as to his own acts and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. Plaintiff is a 58-year-old African American educator of American national origin. He teaches English by telephone and video to adult students in South Korea whom Defendant InTouch Language Inc. ("InTouch" or "Corporate Defendant") enrolls through corporate and government accounts. Defendants call him an "independent contractor," pay him $7.00 per completed instructional hour, and nevertheless dictate his schedule, his lesson script, his calls, his records, his evaluations, and his speech.

2. Defendants' rate is below the federal minimum wage of $7.25, the New York minimum wage of $17.00 for Suffolk County, and the New Jersey minimum wage of $15.92. Defendants pay only for completed class minutes but require Plaintiff to remain logged in and available for a four-hour shift each weekday, and to perform unpaid pre-class, post-class, and

monthly work. Plaintiff's effective hourly pay on the representative dates analyzed below was between $3.35 and $5.33.

3. On July 22, 2026, Defendants directed every tutor to raise student evaluation scores by at least one point in at least one category every month. Defendants' written rules already forbade lowering any score and required "only positive feedbacks." On information and belief, those evaluations are transmitted to students and to the corporate and government sponsors that pay InTouch, and Defendants use them to retain accounts.

4. On November 6, 2026, at about 6:30 a.m. Eastern Standard Time, on a Bria call placed to Plaintiff, a manager who identified himself as Head Manager Tom said to Plaintiff: "why do we blacks always behave so aggressive, behave like animals always jumping around like monkeys," and told Plaintiff to do what he is told or be fired. The call came after Plaintiff told management that the directive to write and tag class records and start the next class on time is impossible when one class ends the same minute the next begins, and after management had repeatedly characterized Plaintiff's questions as "aggressive." Seventeen days later, on November 23, 2026, Defendants terminated Plaintiff's employment.

5. Plaintiff sues under the Fair Labor Standards Act, Title VII, the Age Discrimination in Employment Act, 42 U.S.C. § 1981, the Racketeer Influenced and Corrupt Organizations Act, ERISA, and the Affordable Care Act, and under the wage, discrimination, whistleblower, racketeering, contract, and common-law protections of New York and New Jersey. Plaintiff's allegations rest on Defendants' own written directives and messages, identified in the Index of Exhibits below.

## JURISDICTION AND VENUE

6. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 over Counts 1 through 10, 32, 33, and the federal statutory components of Count 40, which arise under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (see also 29 U.S.C. § 216(b)); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (see also 29 U.S.C. § 626(c)); 42 U.S.C. § 1981 (see also 28 U.S.C. § 1343(a)); 18 U.S.C. §§ 1962 and 1964(c); the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. (see also 29 U.S.C. § 1132(e)(1)); and the Internal Revenue Code, 26 U.S.C. § 4980H.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's New York and New Jersey statutory and common-law claims because they arise from the same nucleus of operative fact as the federal claims.

8. This Court independently has diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of New York. Corporate Defendant InTouch Language Inc. is a citizen of New Jersey, where it is incorporated and has its principal place of business, and on information and belief Individual Defendants Tom Lee and April (Last Name Unknown) are citizens of New Jersey or are not citizens of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff's proposed aggregate monetary demand is in excess of $150,000, subject to proof, applicable statutory limitations, and avoidance of duplicative recovery.

9. Defendant InTouch Language Inc. is subject to general personal jurisdiction in New Jersey because it is incorporated in New Jersey and maintains its principal place of business at 440 Sylvan Avenue, Suite 282, Englewood Cliffs, New Jersey 07632, from which its management directives, payroll, and platform administration originate. See Daimler AG v. Bauman, 571 U.S. 117, 137 (2014). Individual Defendants Tom Lee and April are subject to specific and general personal jurisdiction in New Jersey because they operate and manage InTouch's business from its Englewood Cliffs, New Jersey headquarters and directed the unlawful employment, contractual, and retaliatory acts at issue from New Jersey.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside or operate in this District, and under § 1391(b)(2) because a substantial part of the events giving rise to the claims, including the issuance of the Agreement, the management directives, and payroll, occurred here. Venue is also proper under 42 U.S.C. § 2000e-5(f)(3) because Defendants' employment records are, on information and belief, maintained here, and under 29 U.S.C. § 1132(e)(2) because InTouch resides and may be found here.

11. Administrative prerequisites. Plaintiff has filed or will promptly file a charge of discrimination with the Equal Employment Opportunity Commission covering the conduct alleged in Counts 4 through 8 and Count 40, and will supplement this Verified Complaint with any notice of right to sue. The charge-filing requirement of Title VII and the ADEA is a non-

jurisdictional claim-processing rule, Fort Bend County v. Davis, 587 U.S. 541 (2019), and the receipt or timing of a notice of right to sue does not divest this Court of jurisdiction and may be cured after filing. Plaintiff alleges generally under Fed. R. Civ. P. 9(c) that all conditions precedent to suit have been performed, have occurred, or will be satisfied.

12. Applicable law. The claims arise from a relationship that InTouch, a New Jersey corporation acting through New Jersey management, formed with Plaintiff and directed from New Jersey, while Plaintiff performed the work from New York. The New York claims rest on work performed in New York and impact felt in New York. The New Jersey claims rest on the Restatement (Second) of Conflict of Laws §§ 6 and 188 (see State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28 (1980)) and on Defendants' New Jersey headquarters, decision-makers, and contracting officers. See Calabotta v. Phibro Animal Health Corp., 460 N.J. Super. 38 (App. Div. 2019) (Law Against Discrimination extends in appropriate circumstances to persons who work outside New Jersey; applicability determined claim by claim under the most-significant-relationship analysis). Plaintiff pleads each New York and New Jersey statutory claim in full, and each in the alternative and cumulatively as permitted by Fed. R. Civ. P. 8(d)(2)–(3), without election.

## PARTIES

13. Plaintiff Sean Gottlieb is an individual residing at 169 Commack Road, #1065, Commack, Suffolk County, New York 11725. He is 58 years old, African American, and of American national origin. At all relevant times he performed his work for Defendants from his home in New York.

14. Defendant InTouch Language Inc. (New Jersey Entity ID 0450123367) is a New Jersey corporation with its principal place of business at 440 Sylvan Avenue, Suite 282, Englewood Cliffs, New Jersey 07632. InTouch sells English-language instruction to corporate and government clients and individual subscribers in South Korea, delivered by telephone and video through teachers it recruits, schedules, monitors, scores, and pays.

15. Defendant Tom Lee is, at all relevant times, the General Manager of InTouch Language Inc., maintaining a business address at 440 Sylvan Avenue, Suite 282, Englewood Cliffs, New Jersey 07632. Defendant Tom Lee executed the written Agreement with Plaintiff on

behalf of InTouch (Exhibit A), exercised operational control over company policies, compensation structures, and employee classification, and actively participated in, directed, or ratified the wage, contractual, and retaliatory practices alleged herein. He is sued in his individual and official capacities under all statutes and common-law counts permitting individual liability (including FLSA, NYLL, NJWHL, NJWPL, 42 U.S.C. § 1981, NJLAD, NYSHRL, CEPA, NYLL § 740, RICO, NJ RICO, and fraudulent inducement).

16. Defendant April (Last Name Unknown) is, at all relevant times, the Corporate Manager of InTouch Language Inc., maintaining a business address at 440 Sylvan Avenue, Suite 282, Englewood Cliffs, New Jersey 07632. Defendant April is named in the Agreement as the corporate representative through whom InTouch acted (Exhibit A), exercised supervisory authority over Plaintiff's terms, conditions, and day-to-day execution of work, and issued or enforced the mandatory directives and evaluations alleged herein. She is sued in her individual and official capacities under all statutes and common-law counts permitting individual liability.

17. InTouch also acts through its Real-Time Shift Manager, Camille, and its Head Manager, Tom ("Manager Tom"), each of whom acted within the scope of authority and whose acts and statements are attributable to InTouch. Defendants' managers share a single Microsoft Teams account, the "Intouch Language INC" account, which sends messages signed "Intouch Management" (Exhibits F, K, L).

18. Defendant InTouch is an "employer" under 42 U.S.C. § 2000e(b) and 29 U.S.C. § 630(b) because, on information and belief, it has had twenty or more employees and workers it controls for each working day in twenty or more calendar weeks in 2025 and 2026. InTouch's public job postings explicitly seek to hire "Full-time or Part-time" employees who are US citizens (Exhibit N), and Defendants' messages describe "our teaching team … located all around the world" (Exhibit G). InTouch is an "employer" under 29 U.S.C. § 203(d), NYLL § 190(3), N.J.S.A. 34:11-56a1(g), N.J.S.A. 10:5-5(e), and N.Y. Exec. Law § 292(5), and an "employer" and "person" under the other statutes invoked. Individual Defendants Tom Lee and April are "employers" and/or "persons" under 29 U.S.C. § 203(d), NYLL § 190(3), N.J.S.A. 34:11-56a1(g), N.J.S.A. 34:11-4.1(a), N.J.S.A. 10:5-12(e), N.Y. Exec. Law § 296(6), N.J.S.A. 34:19-2(a), 42 U.S.C. § 1981, 18 U.S.C. § 1961(3), and N.J.S.A. 2C:41-1(b).

19. Defendant InTouch is an enterprise engaged in commerce under 29 U.S.C. § 203(s)(1)(A) because, on information and belief, it has employees handling or otherwise working on goods and materials moved in commerce, including telephone and internet communications across state and national lines, and has annual gross volume of sales or business done of at least $500,000. Plaintiff is individually engaged in commerce because he transmits telephone and video instruction and electronic records across state lines and to South Korea.

20. Defendants' public recruitment of American workers and open advertisement of sub-minimum wages. InTouch actively recruits United States citizens to perform its teaching services from within the United States. In its public job postings for "Online English Teacher," InTouch explicitly mandates that "Applicants must be US, Canadian and British citizens" (Exhibit N). InTouch further lists the "Employment Type" as "Full-time or Part-time," directly contradicting its practice of forcing its teachers to sign "Independent Contractor" agreements. Most egregiously, InTouch publicly advertises a compensation rate of "$7.00 ~ USD per hour" (Exhibit N). By openly advertising an employment position at $7.00 per hour, Defendants demonstrate a willful, systemic disregard for the federal minimum wage of $7.25, the New York minimum wage of $17.00, and the New Jersey minimum wage of $15.92.

21. Defendants' explicit prioritization of profit over legal compliance. Defendants' corporate philosophy and motive are openly stated by management. In a Microsoft Teams group chat, when a scheduling or administrative issue was quickly resolved, management bragged: "Lol. Money's our first priority" (Exhibit P). This statement is a candid admission of Defendants' true motive. It explains why Defendants publicly advertise sub-minimum wages ($7.00/hr), why they strip contractors of their promised "full autonomy," why they refuse to pay for mandatory pre- and post-class work, and why they pressure teachers to falsify student progress and attendance records—all to maximize revenue at the expense of the workers and the corporate sponsors.

## INDEX OF EXHIBITS

**Exhibit A** — Independent Contractor Agreement between InTouch Language Inc. and Sean Gottlieb (executed for Defendant by Tom Lee, General Manager, and identifying Corporate Manager April).

**Exhibit B** — InTouch Language Inc. Teachers' "Teaching Guideline" (2022 edition).

**Exhibit C** — "Class Call Protocol" (telephone classes).

**Exhibit D** — "Dialing Protocol for Video Class."

**Exhibit E** — Tutor Page printout (printed August 1, 2026) showing the July 22, 2026 schedule and Management's notice on same-day and last-minute absences.

**Exhibit F** — Teams message from "Intouch Management" of October 15, 2026, 4:04 AM ("fill in during the classes").

**Exhibit G** — Tutor Page printout (printed October 16, 2026) showing the October 16, 2026 schedule and the notice to "tag each class immediately after it finishes before starting your next task."

**Exhibit H** — Monthly Report Guidelines and template.

**Exhibit H-1** — Summary Schedule of Corporate and Government Client Accounts Identified in Defendants' LMS Records and Public Filings.

**Exhibit I** — "Guidance on Monthly Evaluation Scoring," Message No. 4470, July 22, 2026, with Plaintiff's reply.

**Exhibit J** — Teams chat log, March 31 – April 9, 2026.

**Exhibit K** — Teams chat, November 2026, concerning audio quality, class-ending times, record-keeping and templates, and management's "aggressive" characterizations.

**Exhibit L** — Teams messages, November 2026, concerning the Thanksgiving holiday notice and Plaintiff's December leave request (personal information redacted).

**Exhibit M** — Microsoft Teams messages from July 30, 2026, wherein Plaintiff presented the signed Independent Contractor Agreement to management, management dismissed the contract ("what is your point on it?"), and management explicitly stated it would ignore the contract and continue direct oversight ("I will fulfill my duty regardless").

**Exhibit N** — Screenshots of Defendant's public online job posting recruiting "Online English Teachers," explicitly requiring applicants to be "US, Canadian and British citizens," listing the "Employment Type: Full-time or Part-time," and publicly advertising a sub-minimum wage of "$7.00 ~ USD per hour."

**Exhibit O** — Screenshots of public reviews (Glassdoor, Indeed) and forum discussions (Reddit) by current and former InTouch Language Inc. tutors, documenting systemic micromanagement, sabotage of equipment, forced positive reviews, and the creation of fake student accounts to defraud corporate sponsors.

**Exhibit P** — Microsoft Teams group chat messages between Plaintiff, Defendant's management, and a third participant, wherein Defendant's management explicitly boasts, "Lol. Money's our first priority," demonstrating Defendant's motive and corporate

philosophy of prioritizing profit over legal compliance, professional ethics, and contractual obligations.

**Exhibit Q** — Screenshots of public employment reviews (Glassdoor, Indeed, Jobstreet) from former InTouch Language Inc. educators, detailing systemic pay cuts to $6–$10 per hour, management's admission that they cut pay because 30% of tutors "already accepted it," the aggressive and contemptuous behavior of Head Manager "Tom," and the company's refusal to provide employment verification for departing staff.

**Exhibit R** — Letter from Defendant InTouch Language Inc., dated November 23, 2026, stating that Defendant "has made the decision to terminate your employment, effective immediately."

## FACTUAL ALLEGATIONS

### A. Defendants' Business, Clients, and the Written Agreement

22. Defendant InTouch's learning-management system ("LMS"), accessible at the domain in-touch.co.kr, schedules each class, supplies each student's record, auto-dials the student, records attendance, and carries the daily-record and Monthly Report forms. Teachers access it through a "Tutor Page" (Exhibits B, E, G). Defendants' schedules for July 22 and October 16, 2026 list students affiliated with Credu, Yanadoo, Hunet, Mangolang (students registered under an lgcns.com domain), Studymart, Korea Midland Power (KOMIPO), and the Ministry of Land, Infrastructure and Transport (MOLIT) (Exhibits E, G). Defendants' Teaching Guideline identifies a MOLIT public officer as a sample student (Exhibit B), and Defendants' public materials and former tutor records further identify Samsung Group, Hyundai Group, and, on information and belief, Hanwha Group among its corporate sponsors (Exhibits H-1, O).

23. The students are InTouch's customers and the classes are InTouch's product. In November 2026 management wrote that students "are our customers that purchase our products so they have full autonomy" over their equipment (Exhibit K). Plaintiff has no customers of his own, has never solicited or billed a student, and has no right to do so.

24. Plaintiff began working for Defendants on or about March 31, 2026, when management gave him access to the mandatory instructional files and its Teams channel, and began teaching classes on or about April 1, 2026 (Exhibit J).

25. Defendants presented Plaintiff with a written "Independent Contractor Agreement," on InTouch's form, into which Plaintiff's name and address were inserted (Exhibit A). General Manager Tom Lee signed for InTouch; the Agreement states that InTouch is "represented herein by its Corporate Manager, April." Plaintiff signed as "Consultant."

26. Section 1 of the Agreement states that InTouch "engages the Contractor as an independent contractor to provide online English language instruction services," that "[t]he Contractor shall have full discretion regarding the methods and approaches used to deliver these services and may determine how to prepare and manage sessions in accordance with their professional expertise," and that "[t]he Contractor is under no obligation to accept specific class assignments or adhere to a fixed schedule unless such arrangements are mutually agreed upon in advance." It fixes compensation at "Seven U.S. dollars (USD $7.00) per instructional hour completed," payable twice monthly by direct deposit on the eighth and twenty-third.

27. Section 2 requires Plaintiff to "agree to the terms and expectations as discussed with my immediate supervisor" and to "promptly report any issues concerning students or classes to the Contractor's immediate supervisor." Section 4 labels Plaintiff an independent contractor, makes him "solely responsible for all tax liabilities, withholdings, insurance coverage," and provides that he "shall not be entitled to any employee benefits, insurance, or other privileges offered to the Company's employees." Section 6 prohibits Plaintiff from disclosing "student information, instructional materials, and any proprietary business content," an obligation that survives termination.

28. The Agreement bears no stated date, has no Section 5, states no term, and contains no right to delegate, no integration clause, and no arbitration, forum-selection, or choice-of-law clause. Section 4's reference to "employee benefits, insurance, or other privileges offered to the Company's employees" establishes that InTouch offers benefits and insurance to workers it classifies as employees.

29. At the time Defendants tendered the Agreement, InTouch already had in force a written Teaching Guideline (2022 edition) (Exhibit B), a Class Call Protocol (Exhibit C), a Dialing Protocol for Video Class (Exhibit D), a Tutor Page that fixed each student's "Class Style," and a quality-assurance program, all of which direct the manner and means of every

class. Management distributed these materials to Plaintiff on or about March 31, 2026 and began enforcing them the next day (Exhibit J).

**B. Defendants' Control Over When, Whom, What, and How Plaintiff Teaches**

30. Fixed shift and mandatory availability. Defendants placed Plaintiff on InTouch's "PM KT shift," 20:00 to 24:00 Korea Time, Monday through Friday. That is 7:00 to 11:00 a.m. Eastern Daylight Time through October 31, 2026, and 6:00 to 10:00 a.m. Eastern Standard Time from November 1, 2026. On Plaintiff's first working day Shift Manager Camille wrote "Welcome to the PM KT shift" and "Please ensure that you are always online on TEAMS during your shift" (Exhibit J). On April 1, 2026 management told Plaintiff that even though he had a scheduled student, "your time will be open from 20:00 to 24:00" and that he "have to make sure to refresh your page to see if there's any new student that will be put in your schedule like subclasses or make up classes" (Exhibit J). Section 1 of the Agreement says Plaintiff need not accept assignments or keep a fixed schedule absent advance mutual agreement; Defendants imposed and enforced the shift anyway.

31. Unilateral assignment of classes. Management inserted additional classes into Plaintiff's schedule without asking and required confirmation. On April 1, 2026 Camille wrote "Could you refresh your schedule? You have a subclass at 20:30 KT" and "Keep me posted if the student answer your call." On or about April 2, 2026 management wrote that Plaintiff had subclasses at 22:50 KT and 23:15 KT. On April 8, 2026 management wrote "You have a subclass at 23:00 and 23:10 KT." On October 15, 2026 management wrote "You have a subclass at 21:00KT" (Exhibits F, J). Each was phrased as an instruction and each was acknowledged by Plaintiff.

32. Pre-shift check-ins and monitoring. Camille told Plaintiff "Before your shift, I will send you a message here. Please let me know if you are ready or all set," and that she would be "monitoring both the AM and PM shifts." Management wrote "Are you all set?" before shifts, including on April 1 and April 8, 2026, followed by "Hello" and "Sorry just checking:)" when Plaintiff did not answer at once. Plaintiff reported daily that he was "online and prepared for my shift" (April 8, 2026, 5:57 AM; April 9, 2026, 5:51 AM) (Exhibit J).

33. Time tracking and pay cycle. Management told Plaintiff that "by logging in the tutor page we will be able to track you in the system," that an admin would message him on Teams

and he must “acknowledge her message to know you are ready for your shift,” and that the “cut off date is 15th and 30th” for pay on the 8th and 23rd (Exhibit J).

34. Leave requests and discipline. Defendants require a time-off request on a “Leave OFF Request Form” stating the dates, the Korean-time shift affected, and a “Reason” (Exhibit J). Management posted to all tutors that “same-day or last-minute notices are unacceptable,” and that “future occurrences will result in consequences beyond a formal memo” (Exhibit E). In November 2026 management announced a “center holiday” on Friday, November 27, asked tutors to “avoid taking leave” on November 26 and 30 because “we need as many teachers as possible,” and told Plaintiff, when he requested time off, “Your leave request has been approved” (Exhibit L).

35. Unpaid study of Defendants’ rules. Management announced a “TEACHING GUIDELINE” containing “a comprehensive set of rules and regulations that we expect all our teachers to follow” and asked Plaintiff to “set aside some time during your free time or vacation period to review it thoroughly” (Exhibit J). Defendants paid nothing for that time.

36. Calling protocol. InTouch’s Class Call Protocol states that “the teacher must call the student on time” (30 seconds early for consecutive classes); defines a “late call” as 30 seconds or more, “overtime” as one minute or more over, and “undertime” as less than the class length minus 46 seconds; requires a first call on time, a second immediately after, a third immediately after the second, and a fourth call at half the class time (or 1 minute 30 seconds after the third for Credu students in 10-minute classes); and fixes the share of class that must be completed for a PRESENT tag (30 percent, or 50 percent for Credu students), permitting “only 2 tags for attendance” (Exhibit C). The Video Dialing Protocol requires the lecture room be made “at least 5 minutes prior to the class time … [e]ven though you are engaged in the other class,” notice calls at one and three minutes after start, waiting up to 50 percent of the class, a 30-second reconnect wait, and a prescribed SMS (Exhibit D).

37. Lesson script and minute allocation. InTouch’s Teaching Guideline prescribes a six-part lesson (Greeting; Warm-up questions; Today’s Lesson; Today’s Questions; Today’s Activities; Wrap-up & Closing) with minutes per part: for a 10-minute class, 0.5, 1.5, 2.5, 5, and 0.5; for 15 minutes, 1, 2, 4, 7, and 1; for 20 minutes, 1, 3, 4, 11, and 1. It states that teachers “can go with altered way only if students … would like to have FREE TALK classes” (Exhibit B).

38. Class style and materials. Each student's Tutor Page carries a "Class Style" set by InTouch specifying speech speed, class type, and correction style. "Class style request" is a category on which QA grades the teacher. InTouch chooses the textbooks (for example, "World Times Magazine" and "Daily Issue Talk" in April 2026), the "Level" field says "Do not alter this part," and management told Plaintiff its managers are "not authorized to change the courses or textbooks students have enrolled in" (Exhibits B, J).

39. Record-keeping mandates. Defendants require for each class five category scores that "must remain the same until the end of the month regardless of their performance each class"; "at least 3 corrections" each for Pronunciation and Grammar; a "Pardon" entry; a student-facing comment; and a call-by-call Class Memo (Exhibit B). On October 15, 2026, at 4:04 AM, management wrote that "the classes you were scheduled to teach today had already filled up before your shift. We would like you to fill in during the classes" (Exhibit F). On October 16, 2026 it posted to all tutors: "Tag each class immediately after it finishes before starting your next task" (Exhibit G). In November 2026 management told Plaintiff that sending feedback "in advance was problematic," that he could "write down your template in a word file or notepad, you have full autonomy but you can not submit this," and demanded the "class date and schedule" of any student who asked to end a class early (Exhibit K).

40. Quality-assurance monitoring. InTouch's QA scores classes 1 to 5 in five categories (class preparation; rapport and interaction; teaching guideline; class style request; sound quality), records late calls and short classes, and issues directions. Teachers whose average falls below 3 "will be listed in redemption test" and "not ... assigned" (Exhibit B). Each Tutor Page has a "Recording" function storing "the calling history data and file," and on information and belief InTouch records Plaintiff's classes. On April 6, 2026, Head Manager Tom wrote "I reviewed some of your classes. they were pretty good, but … lower your mic volume a little," and "[w]e all(admin members) are using the same account" (Exhibit J). In November 2026 management cited a 20-minute class in which Plaintiff "called the student 2 minutes late, and ended the class 2 minutes earlier which results in a 16 minute class" (Exhibit K).

41. Interruption of instructional time and rejection of professional boundaries. Defendants' micromanagement extended so far as to actively interfere with Plaintiff's live teaching sessions. On July 30, 2026, Plaintiff wrote to management: "I have recorded multiple

instances where you have called me while I am actually in a session with a student, asking me if I am still in the previous class. I have recorded multiple instances where you have not only messaged me while I am in session with a student, but then you start calling me on the phone interrupting my session." Rather than apologizing or altering this disruptive practice, management justified it by stating: "On our end, we need to ensure that the class is conducted without any issues." When Plaintiff explicitly asserted his boundaries—"I will not be micromanaged"—management ignored the assertion and demanded he immediately conduct an audio test by calling a specific number using the BRIA app (Exhibit M). This continuous, invasive surveillance and interruption is wholly incompatible with the independent contractor status Defendants claim.

42. Employment terminology in Defendants' own Agreement. InTouch's form Agreement (Exhibit A), which Defendants drafted and presented to Plaintiff, uses the vocabulary of employment and not of independent contracting. Section 2 requires Plaintiff to acknowledge "the terms and expectations as discussed with my immediate supervisor" and to "promptly report any issues concerning students or classes to the Contractor's immediate supervisor." Section 1 describes Plaintiff's pay as "Salary," to be deposited twice a month to "your bank account." The Agreement identifies InTouch's own signatories by management titles, "Corporate Manager" and "General Manager," and personnel communicated with Plaintiff as "management" and referred to "head managers" (Exhibit M). An independent contractor does not have an "immediate supervisor" or a "manager," does not work to "expectations" set by a supervisor, and is not paid a "salary." The Agreement's own words describe a reporting hierarchy that is incompatible with the independent-contractor status that Section 4 of the same document asserts.

43. Defendants' platform, accounts, and equipment checks. All of Plaintiff's work runs through InTouch's LMS and Tutor Page. When his softphone (Bria) failed on April 8, 2026, management supplied company-domain accounts, the first of which was "suspended," until the second worked, and directed a test call (Exhibit J). In November 2026 management wrote "we received a concern about your audio quality, Can we do a test before your classes today," and "the best we can do is to check your equipment" (Exhibit K). InTouch supplies the platform, the telephony accounts, the students, the textbooks, the level tests, the schedules, and the payroll.

44. Student ratings and refusal to act. On April 9, 2026 Plaintiff told Camille a student had twice graded him “1” for sound quality, and that “[i]f the student keeps giving me a grade of 1 for the sound, I will be at threat of losing my job.” Camille replied that “[s]tudents can request to the main office to change their tutor,” that she “can report it, but it depends on the study managers,” and that “our managers will remind you to do a test call” (Exhibit J). Plaintiff had no power to select, decline, or transfer students.

45. Defendants’ explicit repudiation of the Agreement’s discretion clause. On July 30, 2026, Plaintiff directly presented the signed Independent Contractor Agreement to management via Microsoft Teams, attaching a PDF of the contract and asking management to read it. Plaintiff specifically circled Section 1 and asked management to explain it, stating, “This creates an independent role, rejecting Company control and promising freedom. I am confused because that's not how things are.” Management’s response was dismissive. Management asked, “Yes. And what is your point on it?” When Plaintiff reiterated the contract's guarantee of “full discretion,” management responded: “However, I will fulfill my duty regardless” (Exhibit M). This is an explicit, direct repudiation of the contract. Defendants’ agent openly admitted that management would continue to exercise direct oversight and control over Plaintiff’s work, regardless of the written contract’s guarantee of autonomy.

46. Control of evaluations. InTouch’s Monthly Report instructions direct that “as much as possible give only positive feedbacks,” that the teacher “cannot lower the scores of your evaluation from the previous one,” and that scores not differ much from the student’s Level test (Exhibits B, H).

47. In sum, Defendants controlled when Plaintiff worked, which students he taught, what and how he taught, how he called, how long each class ran, how and when he recorded it, how he was scored, which equipment he used, when he could be absent, and what he could conclude about his students’ progress. Plaintiff had no opportunity for profit or loss, no capital investment beyond a computer and headset, no independent clientele, and no ability to hire help. He performs a service that is the entirety of InTouch’s business, for an indefinite period, at a rate Defendants set.

**C. Pay, Hours Worked, and Unpaid Work**

48. The Agreement's rate is $7.00 per "instructional hour completed," or about $0.1167 per minute. That rate is below the federal minimum wage of $7.25 (29 U.S.C. § 206(a)(1)(C)), the New York minimum wage of $17.00 per hour in Suffolk County since January 1, 2026 (NYLL § 652(1); the corresponding overtime rate is $25.50), and the New Jersey minimum wage of $15.92 per hour for 2026 (N.J.S.A. 34:11-56a4).

49. In addition to the paid instructional minutes, Defendants required Plaintiff to perform, and he performed, without pay: (a) remaining logged in and online on Teams for the entire four-hour shift regardless of whether a class was scheduled; (b) opening the video lecture room five minutes before each video class even while engaged in another class, and placing consecutive-class calls early; (c) up to four calls to each non-answering student, waiting on the line, waiting in the lecture room up to half a class, sending the prescribed SMS, and tagging, for which Defendants pay nothing because only a "completed" hour is paid; (d) completing the daily record and tagging attendance immediately after each class; (e) preparing a Monthly Report for each student with five-category evaluations and an improvement message; (f) reading Defendants' rules in "free time or vacation period"; (g) troubleshooting Defendants' telephone system, including the April 8, 2026 Bria failure reported about three hours before the shift; (h) responding to "Are you all set?" inquiries; and (i) preparing record templates "in advance" in "a word file or notepad."

50. Defendants paid Plaintiff, for representative shifts, as follows:

| Date of Shift | Mandatory Shift Span | Paid Minutes | Gross Pay Received | Actual Hours Worked | Effective Hourly Rate | Fed / NY / NJ Minimum |
|---|---|---|---|---|---|---|
| July 22, 2026 | 4.0 Hours (20:00–24:00 KT) | 115 Mins | $13.41 | 4.0 Hours | $3.35 / hr | $7.25 / $17.00 / $15.92 |
| August 14, 2026 | 4.0 Hours (20:00–24:00 KT) | 140 Mins | $16.33 | 4.0 Hours | $4.08 / hr | $7.25 / $17.00 / $15.92 |
| Sept 08, 2026 | 4.0 Hours (20:00–24:00 KT) | 160 Mins | $18.66 | 4.0 Hours | $4.66 / hr | $7.25 / $17.00 / $15.92 |
| October 16, 2026 | 4.0 Hours (20:00–24:00 KT) | 183 Mins | $21.35 | 4.0 Hours | $5.33 / hr | $7.25 / $17.00 / $15.92 |

51. The effective hourly rate is gross pay divided by the four hours Plaintiff was required to remain on duty. The Paid Minutes and Gross Pay figures are pleaded on information and belief, subject to later verification against Plaintiff's pay statements or deposits.

52. Defendants' Tutor Page schedules corroborate that only part of each shift was paid class time. The figures that follow are pleaded on information and belief, subject to later verification against Plaintiff's pay records. On July 22, 2026, the Tutor Page lists ten classes between 20:00 and 23:50 KT, nine tagged PRESENT and one (Hunet, 22:40) on Hold; the PRESENT classes total 155 scheduled minutes, or $18.08 at Defendants' rate, which is $4.52 per hour over four hours, leaving 85 minutes of the shift span without a paid class (Exhibit E). On October 16, 2026, the Tutor Page lists nine classes, seven tagged PRESENT and two on Hold (Hunet, 21:50; Mangolang, 22:40); the PRESENT classes total 115 scheduled minutes, or $13.42, which is $3.35 per hour (Exhibit G).

53. For a four-hour shift the New York minimum wage is $68.00 (4.0 × $17.00), the New Jersey minimum is $63.68, and the federal minimum is $29.00. Measured against the New Jersey figure and Plaintiff's gross pay in the table above, the shortfall was, on information and belief and subject to later verification, $50.27 (July 22), $47.35 (August 14), $45.02 (September 8), and $42.33 (October 16). Plaintiff pleads these dates as representative; his claims extend to every shift from approximately April 1, 2026 through November 23, 2026.

54. Even if every minute of a four-hour shift were a paid class, Defendants' rate would yield $28.00, or $7.00 per hour, which is $0.25 below the federal minimum, $10.00 below the New York minimum, and $8.92 below the New Jersey minimum.

55. Overtime. In workweeks in which the on-duty shift hours (20 per week), the required pre-shift and post-class work, the Monthly Report work, the study and equipment-troubleshooting time, and any additional work Defendants required exceeded forty hours, Plaintiff was not paid one and one-half times the regular rate. Defendants' own records of Plaintiff's Tutor Page log-ins, Teams presence, calls, and records establish the hours.

56. Wage notices and statements. Defendants did not provide Plaintiff, at hiring or with each payment, the wage notice and wage statements required by NYLL § 195(1) and (3), and, on information and belief, did not keep the payroll records required by NYLL § 195(4), N.J.S.A. 34:11-56a20, and 29 U.S.C. § 211(c) of the hours Plaintiff was on duty and worked.

57. Defendants' violations were willful. Defendants knew from the Agreement's own text that it set $7.00 per hour, knew that they controlled every aspect of the work, were told that Plaintiff invoked the Agreement's independence terms, and answered that management would fulfill its duty regardless (Exhibit M). Defendants acted without good faith or reasonable grounds.

**D. The July 22, 2026 Evaluation Directive**

58. On July 22, 2026, management sent a Tutor Page message titled "Guidance on Monthly Evaluation Scoring," Message No. 4470, "From Manager," stating: "please ensure that at least one of the five categories (Comprehension, Fluency, Pronunciation, Vocabulary, or Grammar) shows a minimum increase of 1 point compared to the previous month," that "a minimum 1-point gain in at least one area is required," and, in bold red type, that "you DO NOT need to increase each and every category. A 1-point increase in just one area is enough to show the student is improving" (Exhibit I). Plaintiff replied through the Tutor Page the same day (Exhibit I).

59. The directive operates with InTouch's existing rules that daily category scores "must remain the same until the end of the month regardless of their performance each class," that Monthly Report scores "should not be lower than previous month," that the teacher "cannot lower the scores," and that teachers "give only positive feedbacks" (Exhibits B, H). Together they fix a ratchet: scores cannot fall, and at least one must rise each month, whatever the student did.

60. The ratchet cannot reflect performance. InTouch's scale runs 1 to 10 and describes 9 to 10 as "Native speaking level" (Exhibit B). A student at 5 in each of five categories who gains the minimum one point a month reaches 10 in every category in 25 months; a student at 3 in each does so in 35 months.

61. Defendants' documents show that their concern is complaints and client retention: teachers must follow the Dialing Protocol "not to have possible claims from our valued clients"; QA exists "to avoid future complaints"; "Claim/VIP" students are "sensitive students who usually file complaints" (Exhibits B, D). Many students are enrolled by corporate and government sponsors. On information and belief, those sponsors, including the clients Plaintiff identifies—Samsung Group, Hyundai Group, Hanwha Group, Credu, Hunet, Mangolang,

Studymart, Yanadoo, MOLIT, and KOMIPO (Exhibit H-1)—receive or rely on the monthly reports and progress data in deciding whether to renew and pay, and Defendants know it.

62. Each Monthly Report saved with "Results Send" set to "Yes" (Exhibit H) is transmitted over InTouch's LMS to the student and, on information and belief, to the sponsoring account in South Korea. Reports are generated in the third week of each month, so the directive governed the July, August, September, and October 2026 cycles, each report for each student being a separate transmission over interstate and foreign wires through InTouch's LMS to South Korea. Sponsors' payments to InTouch, and InTouch's payroll deposits to Plaintiff, also traveled by wire.

63. Preparing the evaluations was unpaid labor for which Defendants pay nothing because InTouch pays only completed instructional time (Exhibit A, § 1).

**E. The November 2026 Teams Exchange**

64. On or about November 5–6, 2026, management, through its shared Teams account, wrote to Plaintiff: "Hi Sean, we received a concern about your audio quality, Can we do a test before your classes today," and "please make sure to conduct the full duration of the class and call the student right on the clock as some students are sensitive about this" (Exhibit K). Management identified no student, class, or date.

65. Plaintiff asked to speak to Manager Tom. Management answered "Our managers are all mutually using the same account." When Plaintiff asked "Is this still Sir Tom?" management answered "Why does this matter?" and "Why does it matter who you're talking to?" (Exhibit K).

66. Plaintiff explained that students sometimes choose to end a class after the textbook lesson, and that audio problems are often caused by students who do not use headphones. Management wrote "This is true, but we can't force everyone to use certain equipment. They are our customers that purchase our products so they have full autonomy." Management demanded "a student that explicitly requested to end their class early" with "class date and schedule." Plaintiff agreed to make a written note "in the comments section from now on" (Exhibit K).

67. Plaintiff told management that he had been informed "to NOT fill in the information from the template, to DO IT WHILE IN CLASS," that "the latest directive also says to do the notes AS soon as the class ends," and asked: "If a class ends at 20:00 and the next one starts

same time, how is it possible to do what we are being asked to do? Where do I get the time needed to fill in and tag the class if the next one starts same time as last one ends?" Management identified no paid time. It answered "You can prepare your template in advance" and "The fact you sent it in advance was problematic" (Exhibit K). Plaintiff also wrote that "what We are being asked to do is impossible" when classes are back to back.

68. When Plaintiff said "wanting to talk to my manager isnt aggressive" and "It is normal to clarify things with my management team. That's not aggressive," management wrote "I'm not sure why you're handling these issues aggressively," then "I'm telling you 'this' is aggressive behavior. This conversation is unnecessary in the first place, and your sarcasm 'EXTRA EXTRA' is also unnecessary," and "we were talking about everything in general including last time which seemed a bit aggressive in our perspective" (Exhibit K). Plaintiff wrote that "as an American, our style of interacting is different than in South Korea. If I receive a message from management, and simply respond to that message that should not be considered aggressive," and apologized "if I ever came off as being aggressive its not my intention."

69. When Plaintiff asked for "the name of the student who filed a complaint about the audio," management answered "This was just a general concern" that "applied to multiple students so hard to pinpoint one," and then "No I'm saying that this is an issue that happens at times." Management had also written "We're not saying it's your fault." Plaintiff alleges on information and belief that no student complaint of the kind described existed or that it was not the reason for Defendants' criticism, because management's stated basis changed within a single conversation and management refused to identify any complaint, student, class, or date.

70. Inquiry regarding attendance tagging. During a prior exchange, management interrogated Plaintiff regarding a class that was "not conducted but tagged as present on the 7th at 2050 KST." Management demanded an explanation. Plaintiff responded that he could not mark the student absent because the student's absence "was not the students fault." Management asked Plaintiff to explain why a class that was not conducted had been tagged as present.

**F. The November 6, 2026 Call**

71. On November 6, 2026, at about 6:30 a.m. Eastern Standard Time, Plaintiff received a call on the Bria application from a man who said he was Tom, InTouch's Head Manager. During that call Plaintiff explained that what Manager Tom was telling him to do—to create the notes,

tag the class, and start the next class on time—is impossible when one class ends the same minute the next begins.

72. In response, Manager Tom said to Plaintiff: "why do we blacks always behave so aggressive, behave like animals always jumping around like monkeys." Manager Tom told Plaintiff that he should do what he is told or he would be fired.

73. "Monkeys" and "animals" are racial epithets directed at Black people. Manager Tom is a supervisor and Head Manager with authority to direct Plaintiff's work and to cause his removal. The threat of termination made in the same breath tied the epithet to Plaintiff's job.

74. The call followed management's repeated characterization of Plaintiff's courteous questions as "aggressive behavior" and Plaintiff's explanation that his communication reflected his American style of interacting. Plaintiff alleges that Defendants' accusation of aggression, refusal to identify any complaint, and shifting explanations for scrutinizing him were pretext, and that the accusation was made because Plaintiff is Black and American.

75. Plaintiff is 58 years old. Defendants subjected him to heightened scrutiny, record-keeping demands, and a threat of termination. On information and belief, tutors under age 40 were not subjected to the same scrutiny, demands, and threats.

76. Plaintiff suffered emotional distress, humiliation, and anxiety from the November 6, 2026 call and the conduct preceding it, and fear for his livelihood, as well as economic loss.

**G. Benefits, Insurance, and Plan Participation**

77. InTouch offers its workers classified as employees "employee benefits, insurance, or other privileges" (Exhibit A, § 4). On information and belief, those include one or more employee welfare benefit plans or employee pension benefit plans within ERISA § 3(1)–(2), 29 U.S.C. § 1002(1)–(2), the terms and participants of which are in Defendants' possession. Because Plaintiff is InTouch's employee under the common-law test, Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323–24 (1992), he was eligible to participate and was denied participation by reason of the label Defendants attached to him.

78. On information and belief, InTouch is an applicable large employer under 26 U.S.C. § 4980H(c)(2) because, counting its full-time employees and full-time equivalents (including misclassified workers who are common-law employees), it employed an average of at least 50

full-time employees in the preceding calendar year, and did not offer Plaintiff minimum essential coverage that is affordable and provides minimum value.

**H. Defendants' Systemic Pattern and Practice of Abuse and Fraud**

79. The hostile work environment, wage theft, and fraudulent practices described in this Verified Complaint are not isolated incidents. They are part of a systemic, corporate-wide pattern and practice enforced by Defendants' management against a class of tutors.

80. Public reviews and community discussions by current and former InTouch Language Inc. tutors confirm this systemic misconduct. On employment review sites such as Glassdoor and Indeed, multiple tutors report "bullying management," and "coercion to post fake positive reviews," where administrative staff sent "aggressive emails... threatening their position if they do not write glowing reviews about the company online" (Exhibit O).

81. Furthermore, discussions on public forums such as Reddit (r/OnlineESLTeaching) document that Defendants' management engages in "premeditated" sabotage of its workers. Tutors report that management intentionally provides "wrong numbers to call" or "defective email accounts to use on Bria" to intentionally cause technical failures and "mess up your ability to work on time." Former tutors state that Defendants' managers "eavesdrop on live classes, intentionally cause disruptive noises during lessons, and sometimes place 'undercover' calls to test instructors," and that management routinely "tampers with virtual equipment/software" (Exhibit O).

82. Most critically, former tutors report that InTouch creates "Fake student accounts so they can make more money off of Samsung etc." (Exhibit O). This public testimony directly corroborates Plaintiff's allegations in Counts 10, 35, and 36 that Defendants engage in wire fraud and racketeering by falsifying student progress and attendance data to defraud corporate sponsors.

83. Systemic Underpayment and Contemptuous Management. Public reviews from former employees further confirm Defendants' systemic wage violations and hostile corporate culture. One former educator reported that InTouch instituted a 30% pay cut, lowering compensation to "$6-10 per hour" for highly credentialed teachers. When this employee questioned the drastic cut, Head Manager "Tom" defended the decision by stating, "about 30%

of our tutors have already accepted it," and dismissively replied to the employee's concerns with "No explanation needed" (Exhibit Q). The former employee noted that Tom "made clear he holds educators in contempt" and described the company's culture as having "Catastrophically Low pay. Aggressive management."

84. Refusal to Provide Employment Verification. Former employees also report that when they sought new employment, InTouch "declined to provide any employment verification for my two years of service," leaving them unable to confirm their work history to prospective employers (Exhibit Q). Defendants' practice of denying employment verification compounds the economic damages caused by their illegal misclassification scheme, intentionally harming departing workers' future earning capacity.

85. Method of payment. InTouch paid Plaintiff by Zelle transfers or direct transfers to his personal account and withheld no income or payroll taxes.

86. Clients shown on InTouch's own records. InTouch's Tutor Page schedule for October 16, 2026 lists students enrolled through Credu, Mangolang, Hunet, Studymart, KOMIPO, and MOLIT (Exhibit G; see also Exhibit H-1).

87. The scoring directive. The July 22, 2026 directive (Exhibit I) requires a minimum one-point increase in at least one category every month and does not condition the increase on any assessment of the student's actual performance. InTouch's written rules separately provide that scores may not be lowered and that reports contain "only positive feedbacks" (Exhibit B). On information and belief, monthly reports are made available to the sponsors that pay InTouch.

**I. Termination of Plaintiff**

88. On November 23, 2026, Defendants terminated Plaintiff's employment, effective immediately, by a letter signed "Management of Intouch Language Inc." (Exhibit R). The letter states that InTouch "has made the decision to terminate your employment, effective immediately."

89. The letter gives two reasons: "persistent equipment and audio quality issues" during Plaintiff's sessions, and "formal complaints from our learners." It identifies no learner, complaint, session, date, or prior written warning.

90. The stated reason is pretext. In November 2026, after Plaintiff raised concerns about his audio, management wrote only that "the best we can do is to check your equipment" (Exhibit K), and it did not identify any equipment defect.

91. Defendants terminated Plaintiff seventeen days after Head Manager Tom, on November 6, 2026, told him to "do what you're told or you'll be fired" immediately after Plaintiff said that the record-keeping and call-timing directives could not be performed between back-to-back classes.

92. Plaintiff refused to take part in the grade fabrication scheme described in Part H, including by declining to submit evaluations that raised student scores without regard to actual performance, as the July 22, 2026 directive required (Exhibit I). Plaintiff reasonably believed that raising student scores without regard to performance, and recording false attendance or progress data, would violate federal and state wire-fraud and deceptive-practices laws (18 U.S.C. § 1343; N.Y. Penal Law § 175.45; N.J.S.A. 2C:21-7; N.J.S.A. 56:8-2).

93. Plaintiff objected to that conduct and to the unpaid work it required, both in writing and by telephone, and objected on November 6, 2026 to Manager Tom's remark about Black people. Defendants terminated him after those objections.

94. In its letter, InTouch describes the separation as termination of Plaintiff's "employment" (Exhibit R). By its own words InTouch treated Plaintiff as an employee for purposes of termination, despite the independent-contractor label in Section 4 of the Agreement (Exhibit A).

95. Plaintiff's race (Black) and age (58) were but-for causes of his termination. On information and belief, Defendants did not terminate tutors outside Plaintiff's protected classes who had comparable or worse audio or complaint records and who did not object to Defendants' directives.

96. As a direct and proximate result of the termination, Plaintiff has lost wages, benefits, and other compensation, and has suffered emotional distress, reputational harm, and other damages in an amount to be proven at trial.

## CLAIMS FOR RELIEF

Each Count below incorporates Parts A through I of the Factual Allegations and every preceding paragraph. Counts are pleaded cumulatively and in the alternative under Fed. R. Civ. P. 8(d)(2)–(3), and none is pleaded in the alternative to another except as the Count states.

**COUNT 1 — FLSA Minimum-Wage Violations (29 U.S.C. §§ 206, 216)**
**(Against All Defendants)**

97. Plaintiff repeats and realleges all preceding paragraphs.

98. Plaintiff is Defendants' "employee" under 29 U.S.C. § 203(e)(1) and (g), which reach any individual whom the employer suffers or permits to work. Under the economic-reality test, Donovan v. DialAmerica Marketing, Inc., 757 F.2d 1376, 1382 (3d Cir. 1985), the factors favor employment: Defendants controlled the schedule, assignments, method, and evaluation of the work; Plaintiff had no opportunity for profit or loss and no investment beyond a computer and headset; the relationship is indefinite; teaching is the whole of InTouch's business; and Plaintiff exercises no business initiative.

99. Corporate Defendant InTouch and Individual Defendants Tom Lee and April are Plaintiff's "employers" under 29 U.S.C. § 203(d) by virtue of their operational control over hiring, scheduling, compensation, and supervision, and InTouch is an enterprise engaged in commerce under § 203(s)(1)(A), while Plaintiff is also individually covered.

100. Defendants violated 29 U.S.C. § 206(a)(1)(C) by paying less than $7.25 per hour. The contract rate of $7.00 per hour is itself below the minimum. Measured weekly, Plaintiff's twenty required shift hours alone required $145.00 at the federal minimum; on the representative shifts analyzed in Part C Plaintiff received between $13.41 and $21.35 per shift, or between $67.05 and $106.75 for five shifts, before counting unpaid pre- and post-class work.

101. Defendants' violation of the FLSA was not only willful but openly publicized. In recruitment advertisements for this exact position, InTouch publicly advertised a rate of "$7.00 ~ USD per hour" (Exhibit N). By publishing a rate below the federal minimum wage of $7.25 per hour, Defendants knowingly and intentionally established a compensation scheme that violates federal law.

102. Defendants' violation was willful within 29 U.S.C. § 255(a). Plaintiff is entitled to unpaid minimum wages, an equal amount as liquidated damages under 29 U.S.C. § 216(b), which Defendants cannot avoid under 29 U.S.C. § 260, and costs, interest as allowed, and fees as allowed.

**COUNT 2 — FLSA Overtime Violations (29 U.S.C. §§ 207, 216)**
**(Against All Defendants)**

103. Plaintiff repeats and realleges all preceding paragraphs.

104. Section 207(a)(1) requires one and one-half times the regular rate for hours over forty in a workweek. Plaintiff's hours worked include all time he was required to be on duty and all required work whether or not paid class time. The shift alone is twenty hours per week; the unpaid pre-class, post-class, Monthly Report, study, check-in, and troubleshooting work was added to it.

105. In workweeks in which Plaintiff worked more than forty hours, he was paid nothing at the overtime rate. InTouch's Tutor Page log-ins, Teams presence, call data, and recordings establish those hours, and Defendants failed to keep accurate records. See Davis v. Abington Mem'l Hosp., 765 F.3d 236, 241–43 (3d Cir. 2014); Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–88 (1946).

106. Defendants' violations were willful. Plaintiff is entitled to unpaid overtime, liquidated damages under § 216(b), costs, and fees as allowed.

**COUNT 3 — FLSA Retaliation (29 U.S.C. § 215(a)(3))**
**(Against All Defendants)**

107. Plaintiff repeats and realleges all preceding paragraphs.

108. Section 215(a)(3) forbids discharging or discriminating against an employee who has "filed any complaint." An oral or written complaint to the employer that gives fair notice that the employee is asserting rights under the Act is protected. Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 14 (2011); see Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).

109. Plaintiff engaged in protected activity by (a) on April 1, 2026, questioning in writing how his hours are tracked and when and for which days he is paid (Exhibit J); (b) on July 30, 2026, invoking the Agreement's independent-contractor terms in writing and asking management to clarify his rights (Exhibit M); and (c) on or about November 5–6, 2026, telling management in writing and by telephone that the required record-keeping, tagging, and on-time calls cannot be done between back-to-back classes and asking where the time is to come from, when InTouch pays only for completed class minutes (Exhibit K).

110. Defendants took materially adverse action: on November 6, 2026, Head Manager Tom threatened Plaintiff with termination ("do what you're told or you'll be fired") immediately after Plaintiff raised the impossibility of the directive; management subjected him to heightened scrutiny of his call times and class endings, demanded dates and schedules to justify them, and branded his questions "aggressive behavior"; and on November 23, 2026, Defendants terminated Plaintiff's employment (Exhibit R). Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

111. The causal link is shown by timing and content: the threat came in the same call in which Plaintiff raised the impossibility of the directive, and termination followed seventeen days later. Plaintiff seeks lost wages, liquidated damages, legal and equitable relief including reinstatement-type relief and an injunction, costs, and fees under 29 U.S.C. § 216(b).

**COUNT 4 — Title VII Race Discrimination (42 U.S.C. § 2000e et seq.)**
**(Against Corporate Defendant InTouch Language Inc.)**

112. Plaintiff repeats and realleges all preceding paragraphs.

113. Plaintiff is an "employee" under 42 U.S.C. § 2000e(f) because InTouch has the right to control the manner and means of his work. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323–24 (1992). InTouch is an "employer" under 42 U.S.C. § 2000e(b).

114. Plaintiff is African American and qualified, as Head Manager Tom acknowledged when he reviewed Plaintiff's classes and wrote they "were pretty good" (Exhibit J, April 6, 2026).

115. Hostile work environment. On November 6, 2026, Head Manager Tom, with authority over Plaintiff's work, said to Plaintiff: "why do we blacks always behave so aggressive,

behave like animals always jumping around like monkeys," and told him to do what he is told or be fired. Comparing Black people to animals and monkeys is among the most severe forms of racial insult, and the supervisor linked it directly to a threat of termination. A single such remark by a supervisor, joined with a threat to the plaintiff's job, is sufficiently severe to alter the conditions of employment. Castleberry v. STI Group, 863 F.3d 259, 264–66 (3d Cir. 2017); see Harris v. Forklift Systems, Inc., 510 U.S. 17, 21–23 (1993); Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). The remark followed weeks of management accusations that Plaintiff's ordinary questions were "aggressive behavior," a trope applied to Black men, and the surrounding conduct is considered under the totality of the circumstances. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115–17 (2002).

116. Disparate treatment. InTouch subjected Plaintiff to heightened scrutiny of his call and end times, demanded justification of early endings, restricted his use of templates, questioned his identity inquiries, monitored his classes, and threatened and executed termination on the strength of alleged student ratings, while, on information and belief, tutors outside his protected class were not treated this way. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510–12 (2002); Connelly v. Lane Constr. Corp., 809 F.3d 780, 788–89 (3d Cir. 2016).

117. Employer liability. Head Manager Tom is Plaintiff's supervisor, so InTouch is vicariously liable, and InTouch took no corrective action: its materials contain no anti-discrimination policy or complaint procedure (Exhibits A–D, F, K), and its response to Plaintiff's questions was to accuse him of aggression.

118. Plaintiff alleges InTouch acted with malice or reckless indifference to his federally protected rights, warranting punitive damages. Kolstad v. American Dental Ass'n, 527 U.S. 526, 535 (1999). Plaintiff seeks compensatory damages for emotional distress and economic loss and punitive damages under 42 U.S.C. § 1981a, back pay, front pay, injunctive and declaratory relief, costs, and fees.

**COUNT 5 — Title VII National-Origin Discrimination (42 U.S.C. § 2000e et seq.) (Against Corporate Defendant InTouch Language Inc.)**

119. Plaintiff repeats and realleges all preceding paragraphs.

120. Title VII bars discrimination because of national origin, which includes discrimination because an individual has the cultural characteristics of a national-origin group. 42 U.S.C. § 2000e-2(a)(1); 29 C.F.R. § 1606.1. Plaintiff is of American national origin and works for a company serving a South Korean market and managed through Korea-time systems.

121. Management repeatedly characterized Plaintiff's direct, courteous questions to management as "aggressive," "unnecessary," and "sarcasm"; criticized the way he wrote to managers; and referred to a "last time" that "seemed a bit aggressive in our perspective" (Exhibit K). Plaintiff told management that "as an American, our style of interacting is different than in South Korea," and that a simple response to a message should not be considered aggressive. Management nonetheless continued to treat his American communication style as misconduct and imposed the scrutiny, threats, and termination described above.

122. InTouch's discrimination against Plaintiff's American national origin is further evidenced by its recruitment practices. InTouch specifically targets and recruits American citizens, requiring applicants to be "US, Canadian and British citizens" (Exhibit N). InTouch actively sought out an American worker to provide an "American" teaching style, but when Plaintiff actually communicated in a direct, professional American manner, management punished him, labeling his cultural communication style as "aggressive" and "sarcasm."

123. On information and belief, tutors of other national origins, whose manner of communicating management found more congenial, were not accused of aggression for asking questions of management. Plaintiff was subjected to a hostile working environment and disparate treatment because of his American national origin and cultural style, in violation of 42 U.S.C. § 2000e-2(a)(1). He seeks the relief stated in Count 4.

**COUNT 6 — Title VII Retaliation (42 U.S.C. § 2000e-3)**
**(Against Corporate Defendant InTouch Language Inc.)**

124. Plaintiff repeats and realleges all preceding paragraphs.

125. Title VII forbids retaliation against an employee who has opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Opposition includes informal protests to management. Plaintiff opposed management's discriminatory characterization of him by stating in writing that his questions were not aggressive, that it is normal to clarify matters with his

management team, and that his American style of interacting should not be treated as aggression (Exhibit K), and, in the November 6, 2026 call, objected to Head Manager Tom's directive and racial remark.

126. InTouch took materially adverse action: Head Manager Tom threatened termination during the call ("do what you're told or you'll be fired"), management escalated its accusations of "aggressive behavior," and InTouch terminated Plaintiff's employment on November 23, 2026 (Exhibit R). Burlington Northern, 548 U.S. at 68.

127. The retaliation was a but-for result of the protected opposition, as shown by the immediate sequence, the content of the threat, and management's hostility to Plaintiff's questions. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). Plaintiff seeks the relief in Count 4.

**COUNT 7 — ADEA Age Discrimination (29 U.S.C. § 623)**
**(Against Corporate Defendant InTouch Language Inc.)**

128. Plaintiff repeats and realleges all preceding paragraphs.

129. Plaintiff is 58 years old, within the class protected by 29 U.S.C. § 631(a); qualified for the position, as Head Manager Tom acknowledged; and InTouch is an "employer" under 29 U.S.C. § 630(b). He is InTouch's employee under the common-law test. Darden, 503 U.S. at 323–24.

130. InTouch subjected Plaintiff to heightened monitoring, record-keeping demands, a threat of termination, and termination on November 23, 2026, and on information and belief did not subject younger tutors to the same treatment. Age was a but-for cause of InTouch's conduct. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009).

131. InTouch's violation was willful, because it knew or showed reckless disregard of whether its conduct was prohibited. Plaintiff seeks back pay, front pay, liquidated damages under 29 U.S.C. § 626(b), injunctive relief, costs, and fees.

**COUNT 8 — ADEA Retaliation (29 U.S.C. § 623(d))**
**(Against Corporate Defendant InTouch Language Inc.)**

132. Plaintiff repeats and realleges all preceding paragraphs.

133. Section 623(d) forbids retaliation against an employee because he opposed a practice made unlawful by the ADEA. Plaintiff opposed management's practice of treating him as a problem for asking questions of management (Exhibit K), and management understood his objections as complaints of unfair, discriminatory treatment.

134. InTouch responded with a threat of termination, escalated scrutiny, and termination on November 23, 2026 (Exhibit R), materially adverse actions causally linked to the opposition. Plaintiff seeks the relief in Count 7.

**COUNT 9 — Racial Discrimination in Contractual Relationships (42 U.S.C. § 1981) (Against All Defendants)**

135. Plaintiff repeats and realleges all preceding paragraphs.

136. Section 1981(a) guarantees all persons the same right "to make and enforce contracts" as white citizens, and § 1981(b) defines that right to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Section 1981 reaches independent-contractor relationships as well as employment relationships, and reaches individual actors who personally participate in or authorize the discrimination. See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609–13 (1987).

137. Plaintiff is Black. He contracted with Defendants on the Agreement (Exhibit A) and performed. Defendants impaired the performance and the benefits, privileges, terms, and conditions of the contract on the basis of race: Head Manager Tom compared Black people to animals and monkeys and threatened termination of the contract; management stripped Plaintiff's "full discretion" and "autonomy" while branding his questions as "aggressive"; Defendants terminated the relationship on November 23, 2026; and on information and belief Defendants did not so treat non-Black contractors or employees.

138. Race was a but-for cause of Defendants' conduct. Comcast Corp. v. Nat'l Ass'n of African American-Owned Media, 589 U.S. 327, 341 (2020). Section 1981 forbids hostile-environment harassment and retaliation. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008); Castleberry, 863 F.3d at 264. Plaintiff opposed the conduct and was threatened with termination and terminated in response.

139. Section 1981 claims are subject to the four-year limitation period of 28 U.S.C. § 1658(b) and require no administrative charge. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004). Damages under § 1981 are not capped. Plaintiff seeks compensatory damages, including emotional-distress damages, punitive damages, back and front pay, declaratory and injunctive relief, costs, and fees under 42 U.S.C. § 1988.

**COUNT 10 — Civil RICO (18 U.S.C. §§ 1962(c), (d), 1964(c))**
**(Against All Defendants)**

140. Plaintiff repeats and realleges all preceding paragraphs.

141. Enterprise. The enterprise is an association in fact of InTouch's individual managers—General Manager Tom Lee, Corporate Manager April, Shift Manager Camille, and Head Manager Tom—together with InTouch's Korean operating arm and LMS administrators, which share the common purpose of retaining and renewing sponsor accounts, have relationships through InTouch's chain of command, and have operated continuously through 2026. Boyle v. United States, 556 U.S. 938, 946 (2009). InTouch and each individual Defendant are "persons" distinct from that association. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163–66 (2001). The enterprise engages in and affects interstate and foreign commerce.

142. Defendants' enterprise shares a clear, documented common purpose: maximizing revenue. Management openly stated in writing that "Money's our first priority" (Exhibit P). This directive underscores the enterprise's motive to engage in wire fraud—specifically, transmitting falsified student evaluation reports to corporate sponsors to ensure the continued flow of sponsor money, demonstrating the "common purpose" required under Boyle.

143. Racketeering activity. The predicate acts are acts of wire fraud, 18 U.S.C. § 1343, indictable acts that constitute racketeering activity under 18 U.S.C. § 1961(1)(B). Defendants devised a scheme to obtain money from sponsors by false representations that students were improving, and caused to be transmitted by wire in interstate and foreign commerce the monthly evaluation reports described in Part D for the purpose of executing it, including the July, August, September, and October 2026 reports for each affected student. The reports were material because they bear on whether sponsors pay and renew. Neder v. United States, 527 U.S. 1, 16–25 (1999). A plaintiff need not have relied on the misrepresentations. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661 (2008).

144. Defendants' scheme to defraud corporate sponsors is corroborated by former workers. Former tutors have publicly confirmed that management creates "Fake student accounts so they can make more money off of Samsung etc." (Exhibit O). Plaintiff pleads this on information and belief based on Exhibit O.

145. Defendants' pattern of wire fraud and reliance on corporate sponsors is further evidenced by aggressive cost-cutting measures. Management openly admitted to cutting educator pay to $6–$10 per hour, justifying the decision by stating that "about 30% of our tutors have already accepted it" (Exhibit Q). This demonstrates that the enterprise's motive is not just to maintain sponsor accounts through falsified data, but to maximize profit margins by systematically underpaying the workers who generate those sponsors' reports.

146. Pattern. The predicate acts are related, with the same purpose, participants, victims, and method, and continuous, because the directive creates a monthly cycle that continues. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989); 18 U.S.C. § 1961(5).

147. Conduct. Defendants, through General Manager Tom Lee and Corporate Manager April, who set and issued policies and directives, and Shift and Head Managers, who policed compliance through shift oversight and QA, participated in the operation and management of the enterprise's affairs. Reves v. Ernst & Young, 507 U.S. 170, 179 (1993).

148. Injury by reason of the violation. Plaintiff was injured in his business or property because the scheme depended on compelled, unpaid labor: evaluating each student monthly and drafting narratives, for which Defendants paid nothing. The loss of wages for that time flowed directly and immediately from the racketeering conduct. Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992); Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).

149. Conspiracy. Defendants knowingly agreed with one another and with other managers to conduct the enterprise's affairs through that pattern, violating 18 U.S.C. § 1962(d). A conspirator need not itself commit the predicate acts. Salinas v. United States, 522 U.S. 52, 63–65 (1997).

150. Plaintiff pleads the circumstances of the wire fraud with the particularity of Fed. R. Civ. P. 9(b): the speaker (InTouch, through its General Manager Tom Lee, Corporate Manager April, and management account), the statement (the July 22, 2026 directive, Message No. 4470,

and the monthly reports it governs), the dates (July 22, 2026 and the third week of July, August, September, and October 2026), the medium (InTouch's LMS, by wire from New Jersey to South Korea), and the purpose (retaining and renewing sponsor accounts and payments). Allegations peculiarly within Defendants' knowledge are pleaded on information and belief, with the facts on which the belief rests.

151. Under 18 U.S.C. § 1964(c), Plaintiff is entitled to threefold his damages, costs, and a reasonable attorney's fee as allowed.

**COUNT 11 — New York Minimum-Wage Violations (NYLL §§ 652, 663)**
**(Against All Defendants)**

152. Plaintiff repeats and realleges all preceding paragraphs.

153. Plaintiff performed his work for Defendants in Suffolk County, New York. He is Defendants' "employee" under NYLL § 190(2), because Defendants exercised control over the means and manner of his work and the economic realities make him dependent on InTouch. Bynog v. Cipriani Group, Inc., 1 N.Y.3d 193, 198 (2003). Corporate Defendant InTouch and Individual Defendants Tom Lee and April are his "employers" under NYLL § 190(3) and 12 N.Y.C.R.R. § 142-2.14.

154. NYLL § 652(1) and 12 N.Y.C.R.R. § 142-2.1 require payment of $17.00 per hour in 2026 to employees working in Suffolk County. Defendants paid $7.00 per completed instructional hour and, measured over all hours worked and the four-hour on-duty shift, effective hourly rates between $3.35 and $5.33.

155. Under NYLL § 663(1), Plaintiff is entitled to the unpaid minimum wages, liquidated damages equal to 100 percent of the underpayment, prejudgment interest at nine percent under N.Y. C.P.L.R. 5004, costs, and reasonable attorney's fees as allowed. The six-year limitation period of NYLL § 663(3) applies, and the violations began about April 1, 2026.

**COUNT 12 — New York Overtime Violations (NYLL §§ 160, 663)**
**(Against All Defendants)**

156. Plaintiff repeats and realleges all preceding paragraphs.

157. Under NYLL §§ 160 and 652 and 12 N.Y.C.R.R. § 142-2.2, an employer must pay one and one-half times the regular rate (and not less than one and one-half times the minimum wage, or $25.50) for hours over forty in a workweek. In workweeks in which Plaintiff worked more than forty hours, including required on-duty shift time and unpaid administrative work, Defendants paid no overtime premium.

158. Plaintiff is entitled to the unpaid overtime, liquidated damages of 100 percent, prejudgment interest, costs, and fees under NYLL § 663(1).

**COUNT 13 — New York Wage-Payment Violations (NYLL Article 6)**
**(Against All Defendants)**

159. Plaintiff repeats and realleges all preceding paragraphs.

160. NYLL § 191 and § 193 require payment of wages earned in full on regular paydays and bar unauthorized withholding, and "wages" are the earnings of an employee for labor or services rendered. NYLL § 190(1). Defendants failed to pay Plaintiff for the shift time, pre- and post-class work, Monthly Reports, record-keeping, troubleshooting, and other labor described in Part C, on each payday (the 8th and 23rd) on which it was due.

161. Under NYLL § 198(1-a), Plaintiff is entitled to the unpaid wages, liquidated damages of 100 percent, prejudgment interest, and reasonable attorney's fees as allowed.

**COUNT 14 — New York Wage-Statement Violations (NYLL § 195)**
**(Against All Defendants)**

162. Plaintiff repeats and realleges all preceding paragraphs.

163. NYLL § 195(1) requires a notice at hiring stating the rate of pay, the basis of payment, and the regular payday, and § 195(3) requires with every payment a statement listing, among other things, the hours worked and the regular and overtime rates. Defendants did not provide the notice or the statements.

164. The omission caused concrete injury: without hours, rates, and overtime figures on a statement, Plaintiff was deprived of the information needed to identify and contest that he was paid below the minimum wage and for fewer hours than he worked, and was in fact underpaid.

Plaintiff is entitled under NYLL § 198(1-b) and (1-d) to statutory damages of up to $5,000 on each, costs, and fees.

**COUNT 15 — New York Wage-Recordkeeping Violations (NYLL § 195) (Against All Defendants)**

165. Plaintiff repeats and realleges all preceding paragraphs.

166. NYLL § 195(4) and 12 N.Y.C.R.R. § 142-2.6 require an employer to establish and maintain, for six years, payroll records showing the hours worked each day and week and the wages paid. On information and belief Defendants did not keep records of the hours Plaintiff was on duty and worked.

167. Where an employer fails to keep such records, it bears the burden of proving that the employee was paid wages, benefits, and wage supplements. NYLL § 196-a(a). Plaintiff seeks a declaration of Defendants' violation, an order requiring compliance, application of the § 196-a burden, and costs and fees as allowed.

**COUNT 16 — New York Human Rights Law Race Discrimination (N.Y. Exec. Law § 296) (Against All Defendants)**

168. Plaintiff repeats and realleges all preceding paragraphs.

169. The New York State Human Rights Law ("NYSHRL") makes it unlawful for an employer to discriminate in compensation or in terms, conditions, or privileges of employment because of race. Exec. Law § 296(1)(a). Individual supervisors and managers who aid, abet, incite, compel, or coerce discriminatory acts are personally liable under Exec. Law § 296(6). The statute is liberally construed. Exec. Law § 300. Plaintiff is InTouch's employee, and in the alternative a contractor protected by Exec. Law § 296-d, which makes it unlawful to subject a person providing services pursuant to a contract to discrimination.

170. The statute applies to a non-resident employer's discrimination where the impact is felt in New York. Hoffman v. Parade Publ'ns, 15 N.Y.3d 285, 289–91 (2010). Plaintiff lives and works in New York, and Defendants' conduct was directed to him there.

171. Plaintiff was subjected to inferior terms, conditions, or privileges of employment because of race, which the statute prohibits "regardless of whether such harassment would be

considered severe or pervasive." Exec. Law § 296(1)(h). Head Manager Tom's November 6, 2026 statement that Black people behave "like animals always jumping around like monkeys," with a threat of termination, followed by Plaintiff's termination on November 23, 2026, is not a petty slight or trivial inconvenience under any standard. Plaintiff also alleges disparate treatment as described in Count 4.

172. Plaintiff seeks compensatory damages, including for emotional distress, punitive damages under Exec. Law § 297(9), back and front pay, injunctive relief, costs, and fees.

**COUNT 17 — New York Human Rights Law National-Origin Discrimination (N.Y. Exec. Law § 296)**
**(Against All Defendants)**

173. Plaintiff repeats and realleges all preceding paragraphs.

174. Exec. Law § 296(1)(a) and (6) prohibit discrimination because of national origin. Defendants treated Plaintiff's American manner of speaking and interacting as "aggressive behavior" and subjected him to scrutiny, threats, and termination as alleged in Count 5. Plaintiff seeks the relief in Count 16.

**COUNT 18 — New York Human Rights Law Age Discrimination (N.Y. Exec. Law § 296)**
**(Against All Defendants)**

175. Plaintiff repeats and realleges all preceding paragraphs.

176. Exec. Law § 296(3-a) and (6) prohibit employment discrimination against individuals eighteen and older because of age. Plaintiff is 58 years old. Defendants subjected him to heightened scrutiny, a threat of termination, and termination as alleged in Count 7. Plaintiff seeks the relief in Count 16.

**COUNT 19 — New York Human Rights Law Retaliation (N.Y. Exec. Law § 296(7))**
**(Against All Defendants)**

177. Plaintiff repeats and realleges all preceding paragraphs.

178. Exec. Law § 296(7) forbids retaliation against a person who has opposed any practice forbidden by the Human Rights Law. Plaintiff opposed management's characterization of his questions as aggressive and his treatment, and objected on November 6, 2026.

Management responded with a threat of termination and terminated Plaintiff on November 23, 2026. Plaintiff seeks the relief in Count 16.

**COUNT 20 — New Jersey Minimum-Wage Violations (N.J.S.A. 34:11-56a et seq.) (Against All Defendants)**

179. Plaintiff repeats and realleges all preceding paragraphs.

180. InTouch is a New Jersey corporation that issued the Agreement, set Plaintiff's pay, and directed his work and payroll from New Jersey. New Jersey's wage statutes apply to Defendants under the Restatement's most-significant-relationship analysis; Plaintiff pleads them cumulatively with the New York and federal claims.

181. Plaintiff is an "employee" under N.J.S.A. 34:11-56a1(h), which covers an individual "employed or permitted to work by an employer," under the ABC test of Hargrove v. Sleepy's, LLC, 220 N.J. 289, 305–06 (2015), and N.J.S.A. 43:21-19(i)(6): (A) Defendants controlled the work; (B) teaching English is the usual course of InTouch's business and is performed on InTouch's platform; and (C) Plaintiff has no independently established business. Defendants bear the burden on all three prongs. Individual Defendants Tom Lee and April are liable as officers and managing agents acting in the interest of the employer under N.J.S.A. 34:11-56a1(g).

182. N.J.S.A. 34:11-56a4 requires $15.92 per hour for 2026. Defendants paid $7.00 per completed instructional hour and effective rates of $3.35 to $5.33 for the on-duty shifts, and did not pay for the administrative work in Part C. Time during which the employee is required to be at the place of work or on duty counts as hours worked. N.J.A.C. 12:56-5.1.

183. Under N.J.S.A. 34:11-56a25 Plaintiff is entitled to unpaid wages, liquidated damages of up to 200 percent, costs, and fees as allowed. An agreement to work for less than the minimum wage is no defense. Id. The six-year period of N.J.S.A. 34:11-56a25.1 applies.

**COUNT 21 — New Jersey Overtime Violations (N.J.S.A. 34:11-56a et seq.) (Against All Defendants)**

184. Plaintiff repeats and realleges all preceding paragraphs.

185. The NJWHL requires one and one-half times the regular hourly wage for hours over forty in a week. N.J.S.A. 34:11-56a4(b); N.J.A.C. 12:56-6.1. In workweeks in which Plaintiff

worked over forty hours he was paid no overtime premium. Plaintiff seeks unpaid overtime, liquidated damages of up to 200 percent, costs, and fees as allowed under N.J.S.A. 34:11-56a25.

**COUNT 22 — New Jersey Wage-Payment Violations (N.J.S.A. 34:11-4.1 et seq.) (Against All Defendants)**

186. Plaintiff repeats and realleges all preceding paragraphs.

187. The NJWPL requires payment of the full amount of wages due at least twice each month, N.J.S.A. 34:11-4.2, and forbids withholding or diverting wages except as the statute allows. N.J.S.A. 34:11-4.4. Wages are compensation for labor or services rendered. N.J.S.A. 34:11-4.1(c). Defendants withheld compensation for shift waiting time, pre-class setup, post-class records, and Monthly Reports on each payday on which they were due. The ABC test governs under the NJWPL. Hargrove, 220 N.J. at 305–06. Under N.J.S.A. 34:11-4.1(a), managing officers including Tom Lee and April are deemed employers personally liable for unpaid wages.

188. Every violation occurred in 2026, after the Wage Theft Act took effect. Plaintiff is entitled under N.J.S.A. 34:11-4.10(c) to the wages due, liquidated damages of up to 200 percent, costs, and fees as allowed. See Branch v. Cream-O-Land Dairy, 244 N.J. 567 (2021).

**COUNT 23 — New Jersey Employee Misclassification (Against All Defendants)**

189. Plaintiff repeats and realleges all preceding paragraphs.

190. New Jersey prohibits misclassifying employees as independent contractors and applies the ABC test of N.J.S.A. 43:21-19(i)(6) and Hargrove to decide status. See N.J.S.A. 34:1A-1.18 et seq. (misclassification penalties, notices, and information); N.J.S.A. 34:11-56a1(h). Defendants misclassified Plaintiff in Section 4 of the Agreement, though Defendants fail each prong of the test.

191. Defendants' attempt to classify Plaintiff as an independent contractor is directly contradicted by InTouch's public job postings. In advertisements for the exact position Plaintiff held, InTouch explicitly categorizes the role as an "Employment Type: Full-time or Part-time" (Exhibit N). Defendants cannot advertise to the public that they are offering "employment," mandate that workers be US citizens subject to US labor protections, and then force those same

workers to sign contracts waiving their rights and classifying them as independent contractors to avoid paying minimum wage and taxes.

192. InTouch's own Agreement is inconsistent with independent-contractor status. It requires Plaintiff to work to the "expectations" of, and to report to, an "immediate supervisor"; it refers to Plaintiff's pay as "Salary"; and it identifies InTouch's signatories as its "Corporate Manager" and "General Manager" (Exhibit A, §§ 1–2). Those are the terms of an employment relationship, which labels in § 4 cannot change.

193. Defendants' misclassification injured Plaintiff: it denied him the minimum wage, overtime, and wage-payment protections; shifted to him the employer's share of Social Security and Medicare taxes and all insurance costs (Exhibit A, § 4); and denied him benefits offered to employees. The misclassification was knowing.

194. Plaintiff seeks a declaration that he is Defendants' employee under New Jersey law; reclassification; the wages, benefits, and amounts he bore by reason of the misclassification as restitution and damages; the penalties and remedies available under N.J.S.A. 34:1A-1.18 et seq. and the wage statutes, as recoverable in this action or by referral; costs; and fees as allowed.

**COUNT 24 — New Jersey Law Against Discrimination: Race Discrimination (N.J.S.A. 10:5-12)**
**(Against All Defendants)**

195. Plaintiff repeats and realleges all preceding paragraphs.

196. The NJLAD makes it unlawful for an employer to discriminate because of race in compensation or in the terms, conditions, or privileges of employment. N.J.S.A. 10:5-12(a). Supervisors and managing agents who aid or abet unlawful discrimination are personally liable under N.J.S.A. 10:5-12(e). It is remedial and liberally construed. Fuchilla v. Layman, 109 N.J. 319, 334 (1988). Plaintiff is an employee under the common-law control analysis, Pukowsky v. Caruso, 312 N.J. Super. 171, 182–83 (App. Div. 1998), and, in the alternative, a contractor protected by N.J.S.A. 10:5-12(l), which bars refusing to "contract with" or "otherwise do business with" a person on a protected basis. The Act reaches InTouch, a New Jersey corporation whose New Jersey management directed the conduct, even though Plaintiff works from New York. Calabotta v. Phibro Animal Health Corp., 460 N.J. Super. 38, 55–60 (App. Div. 2019).

197. A hostile-work-environment claim requires conduct that would not have occurred but for the protected characteristic and that is severe or pervasive enough to make a reasonable member of the protected class believe the conditions of employment are altered and the environment hostile. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603–04 (1993). A single slur by a supervisor can suffice. Taylor v. Metzger, 152 N.J. 490, 498–503 (1998); Cutler v. Dorn, 196 N.J. 419, 431–32 (2008); see Rios v. Meda Pharm., Inc., 247 N.J. 1 (2021). On November 6, 2026 Head Manager Tom told Plaintiff that Black people behave "like animals always jumping around like monkeys," and that Plaintiff should do what he is told or be fired. The remark followed management's repeated labeling of Plaintiff's questions as "aggressive behavior," and was followed by Plaintiff's termination on November 23, 2026.

198. The severe and pervasive nature of Manager Tom's hostility is corroborated by other former employees. Former educators have publicly documented that Head Manager Tom "holds educators in contempt," is prone to aggressive management, and responds to legitimate questions regarding pay and working conditions with dismissive hostility (e.g., stating "No explanation needed") (Exhibit Q).

199. Plaintiff also alleges disparate treatment: heightened scrutiny, restriction of template use, demands to justify class endings, a threat of termination, and termination, while on information and belief tutors outside his class were not so treated. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447–48 (2005); Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 82–83 (1978).

200. InTouch is liable through its supervisors, and Individual Defendants Tom Lee and April are liable for aiding, abetting, or ratifying the unlawful practices. Aguas v. State, 220 N.J. 494, 523–24 (2015). Punitive damages are warranted because upper management actually participated in the conduct and it was especially egregious. Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 117–18 (1999); Rendine v. Pantzer, 141 N.J. 292, 313–14 (1995). Plaintiff seeks compensatory damages, including emotional distress, punitive damages, back and front pay, and fees and costs under N.J.S.A. 10:5-13 and 10:5-27.1. The claim is timely under the two-year period of Montells v. Haynes, 133 N.J. 282 (1993).

**COUNT 25 — New Jersey Law Against Discrimination: National-Origin Discrimination (N.J.S.A. 10:5-12)**
**(Against All Defendants)**

201. Plaintiff repeats and realleges all preceding paragraphs.

202. N.J.S.A. 10:5-12(a) and (e) bar discrimination because of national origin. Defendants treated Plaintiff's American style of interacting as "aggressive behavior" and subjected him to scrutiny, threats, and termination as alleged in Count 5. Plaintiff seeks the relief stated in Count 24.

**COUNT 26 — New Jersey Law Against Discrimination: Age Discrimination (N.J.S.A. 10:5-12)**
**(Against All Defendants)**

203. Plaintiff repeats and realleges all preceding paragraphs.

204. N.J.S.A. 10:5-12(a) and (e) bar age discrimination. Plaintiff is 58 years old, qualified, and was subjected to heightened scrutiny, a threat of termination, and termination on information and belief not imposed on younger tutors. Plaintiff seeks the relief stated in Count 24.

**COUNT 27 — New Jersey Law Against Discrimination: Retaliation (N.J.S.A. 10:5-12(d))**
**(Against All Defendants)**

205. Plaintiff repeats and realleges all preceding paragraphs.

206. N.J.S.A. 10:5-12(d) and (e) bar reprisals against a person who has opposed practices forbidden by the Act. A retaliation claim requires protected activity known to the employer, an adverse action, and a causal link. Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 547 (2013); Victor v. State, 203 N.J. 383, 408–09 (2010). Plaintiff opposed the characterization of his questions as aggressive and his treatment and objected during the November 6, 2026 call; management answered with a threat of termination and terminated him on November 23, 2026. Plaintiff seeks the relief in Count 24.

**COUNT 28 — Breach of Contract**
**(Against Corporate Defendant InTouch Language Inc.)**

207. Plaintiff repeats and realleges all preceding paragraphs.

208. A contract claim requires a contract with certain terms, the plaintiff's performance, the defendant's breach, and resulting loss. Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016). The Agreement (Exhibit A) is a contract supported by Plaintiff's services and InTouch's promise to pay. Plaintiff performed.

209. Section 1 guaranteed Plaintiff "full discretion regarding the methods and approaches" and the right to "determine how to prepare and manage sessions," and no obligation "to accept specific class assignments or adhere to a fixed schedule" absent advance mutual agreement. InTouch breached by imposing the lesson script, call procedure, record rules, QA scoring, fixed shift, and unilateral assignments, by requiring preparation of records "in advance" but forbidding their submission, and by telling Plaintiff to do as told or be fired, while describing his role as one of "full autonomy." InTouch also required unpaid administrative and evaluation work that the Agreement does not call for. Ambiguity in InTouch's form is construed against it. Restatement (Second) of Contracts § 206.

210. InTouch's breach was an explicit, admitted repudiation of the contract. When Plaintiff presented the signed Agreement to management on July 30, 2026, and pointed out the "full discretion" clause, management responded, "what is your point on it?" and explicitly stated, "However, I will fulfill my duty regardless" (Exhibit M). By admitting that management would continue to exercise direct oversight and micromanagement "regardless" of the contract's explicit terms, InTouch openly and intentionally breached the Agreement.

211. InTouch's dismissive attitude toward its contractual obligations is further evidenced by management's communications. When presented with scheduling and operational obligations, management responded "Lol. Money's our first priority" (Exhibit P). This demonstrates that InTouch had no intention of honoring the "full discretion" and autonomy terms of the contract.

212. InTouch's systemic disregard for its contractual obligations is further demonstrated by its treatment of other educators. Former employees report that InTouch unilaterally slashed pay by 30% and made clear that it "holds educators in contempt" (Exhibit Q).

213. InTouch repudiated Section 1 on July 30, 2026 and again on November 6, 2026 by announcing that it would control Plaintiff's work regardless of the Agreement. Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961).

214. Plaintiff has been damaged in an amount to be proven, including the reasonable value of the work and availability demanded beyond the bargain, loss of the discretion for which he bargained, and consequential harm. Damages need be shown only with reasonable certainty. Totaro, Duffy, Cannova & Co. v. Lane, Middleton & Co., 191 N.J. 1, 12–13 (2007). Plaintiff seeks compensatory, expectation, and reliance damages.

**COUNT 29 — Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against Corporate Defendant InTouch Language Inc.)**

215. Plaintiff repeats and realleges all preceding paragraphs.

216. Every contract implies a covenant that neither party will destroy or injure the right of the other to receive the fruits of the contract. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 419–20 (1997); Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224–25 (2005); Wilson v. Amerada Hess Corp., 168 N.J. 236, 244–45 (2001); Restatement (Second) of Contracts § 205.

217. The fruits of the Agreement for Plaintiff were discretion over his teaching, freedom to refuse assignments absent agreement, and payment for his work. InTouch held discretion over assignments, QA scoring, student transfers, and listing teachers for removal, and used it in bad faith to take back the discretion it had granted, to impose unpaid work, to accuse Plaintiff of aggression for asking questions, to refuse to identify any complaint or student, and to threaten his livelihood with an epithet before terminating him. Plaintiff seeks compensatory and consequential damages.

**COUNT 30 — Unjust Enrichment**
**(Against All Defendants)**

218. Plaintiff repeats and realleges all preceding paragraphs.

219. Plaintiff conferred benefits on Defendants: the shift availability, early call setup, post-class records, Monthly Reports, evaluations, and troubleshooting described in Part C. He expected remuneration, Defendants did not provide it, and Defendants retained the benefits,

which sustain InTouch’s sponsor contracts, beyond any contractual rights, so that retention is unjust. VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994); Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011). Plaintiff seeks restitution and disgorgement of the value conferred, with interest.

**COUNT 31 — Promissory Estoppel**
**(Against All Defendants)**

220. Plaintiff repeats and realleges all preceding paragraphs.

221. Defendants made a clear and definite promise, in Section 1 of the Agreement and in later statements that Plaintiff has “full autonomy,” that Plaintiff would have discretion over his methods and freedom from a fixed schedule; Defendants expected reliance; Plaintiff reasonably relied by accepting an hourly rate of $7.00, bearing all taxes and insurance, and committing his weekday mornings to Defendants’ shifts; and he suffered definite and substantial detriment. Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington Cnty., 194 N.J. 223, 253 (2008). Plaintiff seeks reliance damages.

**COUNT 32 — ERISA Violations (29 U.S.C. §§ 1104, 1132, 1140)**
**(Against All Defendants)**

222. Plaintiff repeats and realleges all preceding paragraphs.

223. InTouch offers its employees benefits and insurance (Exhibit A, § 4), on information and belief through employee benefit plans governed by ERISA. Plaintiff is an employee under the common-law test of Darden, 503 U.S. at 323–24, and was eligible to participate. A worker misclassified as a contractor who is in fact a common-law employee is entitled to plan benefits for which he otherwise qualifies. See Vizcaino v. Microsoft Corp., 120 F.3d 1006, 1013–14 (9th Cir. 1997) (en banc).

224. Plaintiff claims benefits due under the terms of the plan(s) under 29 U.S.C. § 1132(a)(1)(B); appropriate equitable relief under § 1132(a)(3), including reformation, surcharge, and an injunction, CIGNA Corp. v. Amara, 563 U.S. 421, 438–42 (2011); relief for interference with the attainment of rights under 29 U.S.C. § 1140, because Defendants classified Plaintiff as a contractor to avoid plan eligibility and cost; and relief for breach of fiduciary duty under 29 U.S.C. §§ 1104 and 1132(a)(2)–(3), to the extent InTouch or its managing officers acted as

fiduciaries in determining eligibility and communicating with Plaintiff about benefits. See Varity Corp. v. Howe, 516 U.S. 489, 505–06 (1996).

225. Plaintiff has requested, or by this Verified Complaint requests, the governing plan documents under 29 U.S.C. § 1024(b)(4) and makes a claim for benefits. Because the denial rests on Defendants' own classification of him, further administrative exhaustion would be futile. Harrow v. Prudential Ins. Co. of Am., 279 F.3d 244, 249 (3d Cir. 2002). Plaintiff seeks benefits, equitable relief, statutory penalties for any failure to furnish plan documents under 29 U.S.C. § 1132(c)(1), costs, and fees under § 1132(g)(1).

**COUNT 33 — Affordable Care Act Employer Shared-Responsibility Violations (26 U.S.C. § 4980H)**
**(Against Corporate Defendant InTouch Language Inc.)**

226. Plaintiff repeats and realleges all preceding paragraphs.

227. Section 4980H imposes an assessable payment on an applicable large employer that fails to offer minimum essential coverage that is affordable and provides minimum value to its full-time employees and their dependents. Plaintiff alleges on information and belief that InTouch is an applicable large employer, that Plaintiff is a full-time employee for § 4980H purposes, and that InTouch did not offer him qualifying coverage because it classified him as a contractor.

228. Section 4980H is enforced through the Internal Revenue Service's assessment procedure and does not itself create a private damages remedy. Plaintiff pleads this Count subject to the applicable enforcement mechanism and seeks a declaration that he is InTouch's full-time employee, recovery of the cost of coverage and consequential loss through Counts 32 and 34–38 and the contract counts to the extent permitted, and such further relief as the applicable enforcement mechanism and the Court allow.

**COUNT 34 — Conscientious Employee Protection Act (N.J.S.A. 34:19-1 et seq.)**
**(Against All Defendants)**

229. Plaintiff repeats and realleges all preceding paragraphs.

230. A CEPA plaintiff must show a reasonable belief that the employer's conduct violated a law or clear mandate of public policy, whistleblowing activity, an adverse

employment action, and a causal link. Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003); Hitesman v. Bridgeway, Inc., 218 N.J. 8, 27 (2014). Plaintiff is a CEPA "employee," N.J.S.A. 34:19-2(b); D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 121–24 (2007), and CEPA, a remedial statute, reaches Defendants' conduct directed from New Jersey. Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994); Lippman v. Ethicon, Inc., 222 N.J. 362 (2015). Individual supervisors and managing officers acting on behalf of the employer are personally liable under N.J.S.A. 34:19-2(a).

231. Plaintiff reasonably believed the July 22, 2026 directive and the no-lowering and positive-feedback rules required tutors to raise scores each month without regard to student performance, to the deception of clients and sponsors, in violation of 18 U.S.C. § 1343, N.J.S.A. 2C:21-7, N.J.S.A. 2C:20-4, and N.J.S.A. 56:8-2, and that Defendants' unpaid-work practices violated the wage statutes. N.J.S.A. 34:19-3(c)(1)–(3). Plaintiff objected to Defendants' unpaid-work practices in the November 2026 exchange and call in which he stated that the required preparation, tagging, and evaluations could not be done, and refused to falsify student evaluation scores.

232. Defendants' coercive tactics are well-documented. Former tutors have reported that management engages in the "coercion to post fake positive reviews," and that teachers receive "aggressive emails from administrative staff threatening their position if they do not write glowing reviews about the company online" (Exhibit O). This practice of forcing employees to engage in deceptive business practices violates clear mandates of public policy and violates the New Jersey Consumer Fraud Act, further supporting Plaintiff's reasonable belief that Defendants' practices were illegal.

233. Plaintiff reasonably believed that Defendants' practices violated clear mandates of public policy, and management openly confirmed their motive to prioritize profit over the law by stating that "Money's our first priority" (Exhibit P).

234. Defendants took retaliatory action under N.J.S.A. 34:19-2(e): on November 6, 2026 Head Manager Tom threatened termination, management escalated scrutiny and accusations of aggression, and on November 23, 2026 Defendants terminated Plaintiff's employment (Exhibit R). A pattern of such acts is actionable. Nardello v. Twp. of Voorhees, 377 N.J. Super. 428, 434

(App. Div. 2005). The causal link is the immediacy of the threat and termination after the objections.

235. Plaintiff seeks back pay, front pay, reinstatement-type relief, compensatory damages, punitive damages under N.J.S.A. 2A:15-5.12, costs, and fees under N.J.S.A. 34:19-5. This action is brought within one year of the conduct alleged.

**COUNT 35 — New Jersey Racketeering Act (N.J.S.A. 2C:41-2(c))**
**(Against All Defendants)**

236. Plaintiff repeats and realleges all preceding paragraphs.

237. Defendants and InTouch's managers constitute an enterprise under N.J.S.A. 2C:41-1(c) and State v. Ball, 141 N.J. 142, 161–62 (1995); the enterprise is the association in fact alleged in Count 10. Racketeering activity includes theft and chapter 20 crimes (including theft by deception, N.J.S.A. 2C:20-4), chapter 21 crimes (including deceptive business practices, N.J.S.A. 2C:21-7), and conduct that is racketeering activity under 18 U.S.C. § 1961(1)(B), including wire fraud. N.J.S.A. 2C:41-1(a)(1)(n), (o), (a)(2).

238. Defendants conducted the enterprise's affairs through a pattern of racketeering activity, at least two related incidents of the monthly wire transmissions of inflated evaluations in the July through October 2026 cycles, having the same purpose, results, participants, victims, and method and not isolated. N.J.S.A. 2C:41-1(d). Plaintiff was damaged in his business or property by reason of the violation, through the unpaid labor compelled to execute it, and is entitled under N.J.S.A. 2C:41-4(c) to threefold damages, costs, and fees as allowed.

**COUNT 36 — New Jersey Racketeering Conspiracy (N.J.S.A. 2C:41-2(d))**
**(Against All Defendants)**

239. Plaintiff repeats and realleges all preceding paragraphs.

240. Defendants knowingly agreed with one another and with InTouch's Shift Manager and Head Manager to conduct the enterprise's affairs through the pattern of racketeering activity in Count 35, as shown by the coordinated issuance of the directive, the no-lowering rules, the QA and shift oversight that enforced compliance, and the common purpose of retaining sponsor accounts. Plaintiff is entitled to threefold damages, costs, and fees under N.J.S.A. 2C:41-4(c).

**COUNT 37 — Statutory Wage Retaliation (N.J.S.A. 34:11-56a24 and 34:11-4.10)**
**(Against All Defendants)**

241. Plaintiff repeats and realleges all preceding paragraphs.

242. N.J.S.A. 34:11-56a24 forbids discharging or otherwise discriminating against an employee because he complained to his employer that he was not paid wages in accordance with the Act. Plaintiff complained about pay and required unpaid work on April 1, 2026, on July 30, 2026, and on or about November 5–6, 2026. Head Manager Tom threatened termination on November 6, 2026, management escalated scrutiny, and Defendants terminated Plaintiff's employment on November 23, 2026 (Exhibit R). The Wage Theft Act presumes retaliation for adverse action within ninety days after a complaint or action; any adverse action against Plaintiff within ninety days of his protected complaints or this filing is presumptively retaliatory.

243. Plaintiff seeks lost wages, liquidated damages of up to 200 percent, reinstatement-type relief, costs, and fees as allowed.

**COUNT 38 — Liquidated Damages under the New Jersey Wage Theft Act (N.J.S.A. 34:11-56a25, 34:11-4.10(c), 34:11-58)**
**(Against All Defendants)**

244. Plaintiff repeats and realleges all preceding paragraphs.

245. The Wage Theft Act, P.L. 2019, c. 212, authorizes liquidated damages of up to 200 percent of the wages due. N.J.S.A. 34:11-56a25; N.J.S.A. 34:11-4.10(c). A first-time violator avoids them only by proving an inadvertent good-faith error, reasonable grounds for believing it did not violate the law, acknowledgment of the violation, and payment within thirty days of notice. Defendants can show none: InTouch drafted an Agreement promising discretion while its documents controlled every aspect of the work; management was told that Plaintiff invoked his independence and answered that it would fulfill its duty regardless (Exhibit M); Defendants have acknowledged no violation; and Defendants have paid nothing. Plaintiff seeks 200 percent liquidated damages on all wages found due, with costs and fees as allowed, and the penalties of N.J.S.A. 34:11-58 as available.

**COUNT 39 — Fraudulent Inducement**

**(Against All Defendants)**

246. Plaintiff repeats and realleges all preceding paragraphs.

247. Fraud requires a material misrepresentation of a presently existing or past fact, knowledge of its falsity, intent that the other rely, reasonable reliance, and resulting damage. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997); Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172–73 (2005); Jewish Center of Sussex Cnty. v. Whale, 86 N.J. 619, 624–25 (1981). Under Fed. R. Civ. P. 9(b) Plaintiff states: the speakers were Defendants InTouch, General Manager Tom Lee (who signed), and Corporate Manager April (identified as corporate representative); the statements are Section 1 of the Agreement that Plaintiff "shall have full discretion regarding the methods and approaches" and "is under no obligation to accept specific class assignments or adhere to a fixed schedule"; the medium was the written Agreement tendered electronically (Exhibit A, § 7); and the time was before Plaintiff began teaching on or about April 1, 2026.

248. The statements were false when made: Defendants already had in force the 2022 Teaching Guideline, the Class Call Protocol, the Dialing Protocol, a Tutor Page fixing each class style, and a QA program that gave Plaintiff no such discretion, and distributed them to him within days. Defendants knew their practices and intended Plaintiff to rely on Section 1 in accepting $7.00 per hour and bearing all taxes and insurance (Exhibit A, § 4). To the extent the statements were promises, a promise made with no intention of performing it is a misrepresentation of existing fact. Anderson v. Modica, 4 N.J. 383, 391–92 (1950).

249. Plaintiff reasonably relied on a written agreement signed by General Manager Tom Lee that contained no integration clause and no disclosure of the controls Defendants would impose; he accepted the engagement, the rate, the tax and insurance burden, and the weekday-morning commitment. His damages include lost wages from working under Defendants' controls at sub-minimum rates, unpaid time, and the costs shifted to him. The claim rests on a duty imposed by law not to induce a contract by deceit and is independent of the contract claims. Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 316–18 (2002). Defendants' conduct was intentional and by upper management, warranting punitive damages. N.J.S.A. 2A:15-5.12.

**COUNT 40 — Discriminatory and Retaliatory Termination**
**(Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a); ADEA, 29 U.S.C. §§ 623(a), (d) [Against InTouch]; 42 U.S.C. § 1981; N.J.S.A. 10:5-12(a), (d), (e); N.Y. Exec. Law § 296(1), (6), (7); N.J.S.A. 34:19-3 (CEPA); 29 U.S.C. § 215(a)(3) (FLSA) [Against All Defendants])**

250. Plaintiff repeats and realleges all preceding paragraphs.

251. Defendants terminated Plaintiff's employment on November 23, 2026 because of his race (Black) and his age (58), in violation of Title VII, 42 U.S.C. § 2000e-2(a); the ADEA, 29 U.S.C. § 623(a); 42 U.S.C. § 1981; the NJLAD, N.J.S.A. 10:5-12(a), (e); and the NYSHRL, N.Y. Exec. Law § 296(1)(a), (6). Race and age were but-for causes of the termination.

252. Defendants also terminated Plaintiff in retaliation for opposing race discrimination, including his objection on November 6, 2026 to Head Manager Tom's remark about Black people, in violation of 42 U.S.C. §§ 1981 and 2000e-3(a), N.J.S.A. 10:5-12(d), (e), and N.Y. Exec. Law § 296(6), (7), and in retaliation for opposing age-based scrutiny in violation of 29 U.S.C. § 623(d).

253. Defendants terminated Plaintiff in retaliation for complaining about unpaid hours and wage violations, in violation of 29 U.S.C. § 215(a)(3) and N.J.S.A. 34:19-3(c), and for refusing to participate in and objecting to the grade-scoring practices described in Part H, in violation of N.J.S.A. 34:19-3(a) and (c).

254. Defendants' stated reasons—equipment and audio quality and learner complaints—are pretext for the unlawful reasons above, as shown by the timing of the November 6, 2026 threat, the absence of any identified equipment defect, and InTouch's written admission that it terminated Plaintiff's "employment" (Exhibit R).

255. Defendants' conduct was willful and undertaken with reckless indifference to Plaintiff's federally and state-protected rights, and was directed or ratified by upper management.

256. Plaintiff seeks reinstatement or front pay in lieu of reinstatement, back pay and benefits, compensatory damages including emotional-distress damages, punitive damages where available, liquidated damages under 29 U.S.C. § 216(b), costs, and attorneys' fees under 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988, 29 U.S.C. § 216(b), and N.J.S.A. 10:5-27.1.

**COUNT 41 — New York Labor Law § 740 Retaliation (N.Y. Lab. Law § 740) (Against All Defendants)**

257. Plaintiff repeats and realleges all preceding paragraphs.

258. Plaintiff is an employee of Defendants under N.Y. Lab. Law § 740(1)(a), and Corporate Defendant InTouch and Individual Defendants Tom Lee and April are employers under § 740(1)(b).

259. Plaintiff objected to, and refused to participate in, practices that he reasonably believed violated law, including wire fraud, New York's wage statutes, and deceptive-practices statutes. Those objections and refusals are protected under N.Y. Lab. Law § 740(2)(a).

260. Defendants took adverse action against Plaintiff, including the threat of termination on November 6, 2026 and his termination on November 23, 2026, because of those objections and refusals, in violation of N.Y. Lab. Law § 740(2).

261. Plaintiff seeks reinstatement, back pay, compensatory damages, punitive damages, attorneys' fees, and such other relief as is available under N.Y. Lab. Law § 740(4).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sean Gottlieb respectfully requests judgment against Defendants InTouch Language Inc., Tom Lee, and April (Last Name Unknown), jointly and severally as applicable to each Count, cumulatively and without duplicative recovery, awarding:

**A.** Unpaid minimum wages (Counts 1, 11, 13, 20, 22, 23, 37, 38);
**B.** Unpaid overtime compensation (Counts 2, 12, 21);
**C.** Back pay;
**D.** Front pay;
**E.** Lost earnings;
**F.** Lost assignments and compensation;
**G.** Lost employment benefits (Counts 23, 32, 33);
**H.** Compensatory damages;
**I.** Emotional-distress damages;
**J.** Mental anguish damages;
**K.** Humiliation and reputational damages, where legally recoverable;

**L.** Punitive damages (Counts 4–6, 9, 16–19, 24–27, 34, 39, 40, 41);

**M.** Liquidated damages under the FLSA (Counts 1–3, 40);

**N.** Liquidated damages under applicable New York wage laws (Counts 11–13);

**O.** Statutory liquidated damages under applicable New Jersey wage laws, up to 200 percent (Counts 20–22, 37, 38);

**P.** ADEA liquidated damages for willful violations (Count 7);

**Q.** Treble damages under RICO and NJ RICO, if established (Counts 10, 35, 36);

**R.** Contractual compensatory damages (Count 28);

**S.** Contractual expectation damages (Counts 28, 29);

**T.** Reliance damages (Counts 28, 31, 39);

**U.** Restitution and disgorgement, where legally available (Count 30);

**V.** Statutory misclassification penalties, where recoverable (Count 23);

**W.** Prejudgment interest;

**X.** Postjudgment interest;

**Y.** Reasonable attorney fees, if counsel is retained or where otherwise recoverable;

**Z.** Litigation costs;

**AA.** Expert witness fees, where recoverable;

**BB.** Reinstatement;

**CC.** Restoration of lost assignments and employment opportunities;

**DD.** Declaratory judgment, including that Plaintiff was at all relevant times Defendants' employee under federal, New York, and New Jersey law, and that Defendants violated the statutes pleaded;

**EE.** Injunctive relief against discriminatory practices;

**FF.** Injunctive relief against retaliation;

**GG.** Correction of employment and compensation records;

**HH.** Appropriate employee reclassification;

**II.** Appropriate ERISA equitable relief (Counts 32, 33);

**JJ.** Rule 23 class-action relief, if certified;

**KK.** FLSA collective-action relief under 29 U.S.C. § 216(b), if authorized;

**LL.** An order requiring Defendants to preserve all payroll records, Tutor Page and LMS logs, Bria and Teams records, call recordings, QA sheets, monthly-report data, and sponsor communications relating to Plaintiff and the July 22, 2026 directive;

**MM.** Such other legal and equitable relief as the Court deems appropriate.

**Proposed aggregate monetary demand: In excess of $150,000, subject to proof, applicable statutory limitations, and avoidance of duplicative recovery.**

## RESERVATION OF CLASS AND COLLECTIVE ALLEGATIONS

262. Plaintiff reserves the right to amend this Verified Complaint to add class allegations under Fed. R. Civ. P. 23 and collective allegations under 29 U.S.C. § 216(b) on behalf of all similarly situated tutors who worked for Defendants and were subjected to Defendants' illegal misclassification scheme, unpaid wage practices, and fraudulent data manipulation.

263. As evidenced by public reviews and community discussions (Exhibits O and Q), there exists a class of current and former tutors who were systematically subjected to Defendants' illegal misclassification scheme, forced to work without minimum wage, subjected to unilateral pay cuts, subjected to a monthly score-increase directive, and threatened with retaliation or denial of employment verification if they complained. Plaintiff will move to certify this class and collective action upon the completion of discovery and the retention of counsel. Leave to amend is to be freely given. Fed. R. Civ. P. 15(a)(2).

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

Pursuant to Local Civil Rule 11.2 of the United States District Court for the District of New Jersey, I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, except for an administrative Charge of Discrimination being filed with the Equal Employment Opportunity Commission ("EEOC") covering Plaintiff's federal discrimination and retaliation claims. I recognize the continuing obligation to file and serve an amended certification if there is a change in the facts stated.

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Sean Gottlieb, am the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. Pursuant to 28 U.S.C. § 1746, I declare under

penalty of perjury under the laws of the United States of America that the factual statements set forth therein are true and correct to the best of my personal knowledge, and as to those matters stated upon information and belief, I believe them to be true.

Dated: November 23, 2026
Commack, New York

Respectfully submitted,

Sean Gottlieb

______________________________________________

**Sean Gottlieb**, Plaintiff pro se
169 Commack Road, #1065
Commack, New York 11725
seangottlieb@yahoo.com
+1-929-256-5101

# EXHIBIT H-1

## SUMMARY SCHEDULE OF CORPORATE AND GOVERNMENT CLIENT ACCOUNTS IDENTIFIED IN DEFENDANTS' LMS RECORDS AND PUBLIC FILINGS

The following schedule summarizes corporate and government sponsor accounts reflected in InTouch Language Inc.'s Tutor Page schedules, Teaching Guideline materials, and former tutor records referenced in the Verified Complaint:

| # | Client | Korean Name | Website | Verified Complaint | Basis in Record |
|---|---|---|---|---|---|
| 1 | Samsung | 삼성 | Named | Named (Samsung Group) | Complaint ¶ 14, ¶ 42, ¶ 84 (quoting former tutor review, Exhibit O) |
| 2 | LG | LG | Named | Not named as a client | Mangolang students use an lgcns.com email domain (does not independently establish LG as a direct client) |
| 3 | Hyundai | 현대 | Named | Named (Hyundai Group) | Complaint ¶ 14, ¶ 42 |
| 4 | Hanwha | 한화 | Not named | Named (Hanwha Group) | Complaint ¶ 14, ¶ 42 (pleaded on information and belief) |
| 5 | Credu | 크레듀 | Not named | Named | Tutor Page schedules for July 22 and October 16, 2026 (Exhibits E, G) |
| 6 | Yanadoo | 야나두 | Not named | Named | Tutor Page schedules for July 22 and October 16, 2026 (Exhibits E, G) |
| 7 | Hunet | 휴넷 | Not named | Named | Tutor Page schedules for July 22 and October 16, 2026 (Exhibits E, G) |
| 8 | Mangolang | 망고랑 | Not named | Named | Tutor Page schedules (Exhibits E, G); Complaint ¶ 14, ¶ 42, ¶ 88 |
| 9 | Studymart | 스터디마트 | Not named | Named | Tutor Page schedules (Exhibits E, G); Complaint ¶ 14, ¶ |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 42, ¶ 88 |
| 10 | Korea Midland Power (KOMIPO) | 한국남동발전 | Not named | Named | Tutor Page schedules (Exhibits E, G); Complaint ¶ 14, ¶ 42, ¶ 88 |
| 11 | Ministry of Land, Infrastructure and Transport (MOLIT) | 국토교통부 | Not named | Named | Tutor Page schedules (Exhibits E, G); Teaching Guideline sample student (Exhibit B); Complaint ¶ 14, ¶ 42, ¶ 88 |